**UNITED STATES of America, Appellee,**

v.

**Henry TRESVANT, III, Appellant.**

**No. 79–5339.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1982.

Decided May 5, 1982.

\* Honorable Joe M. Ingraham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. Section 1112 provides as follows:
   § 1112. Manslaughter

---

John P. McGeehan, Alexandria, Va., for appellant.

D. McCarty Thornton, Sp. Atty., Dept. of Justice, Washington, D. C. (Justin W. Williams, U. S. Atty., Joseph J. Aronica, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before INGRAHAM,\* Senior Circuit Judge, and WIDENER and PHILLIPS, Circuit Judges.

INGRAHAM, Circuit Judge:

In this appeal Henry R. Tresvant, III, challenges the sufficiency of the evidence underlying his conviction of involuntary manslaughter. 18 U.S.C. § 1112 (1976).[1]

> (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
> Voluntary—Upon a sudden quarrel or heat of passion.
> Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or

Our range of inquiry into the sufficiency of evidence supporting jury verdicts in criminal cases is necessarily somewhat constrained, and under the relevant standards of review we must affirm the conviction in this case.

The following facts were essentially undisputed at trial. At approximately 3:30 A.M. on June 15, 1979, a motorist named Shossein M. Shayestehpour was driving from Washington, D. C. into Virginia on the northbound side of the George Washington Memorial Parkway, near the intersection of the Parkway and the Capital Beltway. Shayestehpour encountered a 1975 Toyota stopped in the right lane of the Parkway. He stopped his car and knocked on the window of the Toyota. The deceased, Louise Lytzen, was behind the wheel in a semi-conscious condition. A subsequent autopsy report determined that the deceased had a blood-alcohol level of .19%. After unsuccessfully attempting to rouse Ms. Lytzen, Shayestehpour took her keys, turned on the flashing hazard lights on the Toyota and returned to his car, a Volkswagen, to move it off the highway in front of the Toyota. As he walked back toward the Toyota he noticed headlights coming up the Parkway. Shayestehpour managed to signal this car to stop, and the driver indicated he would call the police for assistance. A second car subsequently approached and passed Shayestehpour and the Toyota without stopping. The third car to approach was driven by the defendant. While the first two cars apparently were in the left, unblocked lane at all relevant times, the defendant's car was in the right lane. From a position behind the Toyota, Shayestehpour jumped up and down in an attempt to signal the driver of the third car, but jumped out of the way when it was apparent the car was not stopping or changing lanes. The defendant collided with the rear of the Toyota, which then caught fire and collided with Shayestehpour's Volkswagen. The defendant's car came to rest in the green median strip to the left of the roadway.

The defendant ran back to the Toyota and asked Shayestehpour if there was anyone in the car. Shayestehpour told him there was, and told him to get something to break the windows of the car and try and save Ms. Lytzen. Defendant went back to his car, retrieved a tire jack and broke the front windshield of the Toyota. According to the defendant's testimony, by this time the heat of the fire was too intense to allow any further rescue efforts. The parties stipulated that the cause of Ms. Lytzen's death was the fire that resulted from the collision.

Officer Feltham of the United States Park Police was among the officials responding to the accident. Officer Feltham testified that when he approached the defendant it was his opinion that the defendant had a strong odor of alcohol on his breath and that his eyes were glassy and bloodshot. Feltham arrested the defendant for driving while intoxicated. Incident to this arrest Feltham searched the defendant and seized a cannister containing a small amount of a substance later determined to be marijuana. Small amounts of marijuana and related paraphernalia were also seized from the defendant's car. The defendant was then taken to the Arlington County Jail, where a breath test to determine blood-alcohol level was performed. The test showed the defendant's blood-alcohol level to be .07%.

Tresvant was indicted by grand jury on two counts: involuntary manslaughter under 18 U.S.C. § 1112; and unlawfully exceeding the speed limit by driving in excess of seventy miles an hour. 36 C.F.R. § 50.-

without due caution and circumspection, of a lawful act which might produce death.
(b) Within the special maritime and territorial jurisdiction of the United States,
Whoever is guilty of voluntary manslaughter, shall be imprisoned not more than ten years;
Whoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or imprisoned not more than three years, or both. June 25, 1948, c. 645, 62 Stat. 756. Tresvant's conviction arises out of an automobile accident on the George Washington Memorial Parkway, an area within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 7(3) (1976). *See generally* 36 C.F.R. Part 50 (1981).

1020

31(b) (1981). The involuntary manslaughter count more specifically charged that the defendant caused the death of Louise Lytzen while driving a car during the commission of unlawful acts not amounting to felonies, those acts being driving in excess of the posted speed limit, in violation of 36 C.F.R. § 50.31(b),[2] driving while under the influence of intoxicating liquor in violation of 36 C.F.R. § 50.28(c),[3] and driving under the influence of a self-administered intoxicating drug (marijuana), in violation of 18 U.S.C. § 13 (1976), assimilating Virginia Code § 18.2–266 (Michie, 1975). Further, following the language of § 1112, the indictment charged the defendant was engaged in a lawful act which might produce death, driving, without due caution and circumspection (in a manner amounting to criminal negligence).

The evidence of speed and intoxication was as follows:

*Speed*

The posted speed limit for the Parkway was fifty miles per hour throughout the area of the accident. On direct testimony, in response to a question whether he knew or had any impression of the speed of defendant's car, Shayestehpour testified "I don't know how fast. But it was fast." The defendant testified that he looked at his speedometer shortly before the collision and noted that it was slightly to the left of center, center representing fifty miles an hour, and also that he was "shaky, sort of paranoid" when driving along this highway because of a prior collision with a deer that had run out of the woods. In addition to this testimony the government introduced photographs of the damage to the vehicles, and evidence concerning skid marks and the movement of the vehicles as the result of the collision. The Toyota was extensively damaged; the rear of the car was pushed forward approximately sixty-two inches. The defendant's car, a Chevrolet, suffered damage in the right front and to the engine, although the car was apparently drivable with minor repairs to the engine. After the initial impact, the defendant's Chevrolet had traveled four hundred and nineteen feet up the highway with the engine rendered inoperable; the Toyota was pushed seventy feet until collision with Shayestehpour's Volkswagen; after this second impact the Toyota moved eighteen-twenty feet farther and the Volkswagen was pushed sideways twelve-thirteen feet. The highway had a slight uphill grade of approximately 2% throughout the area.

The government also introduced results of an experiment in which a 1975 Toyota was placed on the highway in approximately the same position and at the same time as the accident, and a police officer walked back down the highway to ascertain the car's visibility. The rear lights of the Toyota were both visible from five hundred and forty feet and at least one light was visible up to $^3/_{10}$ths of a mile down the highway. Referring to the standardized stopping tables in the Virginia Code, § 46.1–195, the government sought to impress the jury that if the defendant had actually been traveling at or below the speed limit, the five hundred and forty feet visibility distance would have given the defendant at least three full opportunities to bring his car to a full stop upon seeing the Toyota.

In support of Count Two of the indictment, speeding in excess of seventy miles an hour, the government had prepared a reconstruction study that concluded, largely on the basis of the measurements of the distances traveled by the cars, that the defendant's car had been traveling at a specific speed in excess of seventy miles per hour. This study was excluded, however, and its exclusion is not challenged on appeal. Sur-

---

**2.** § 50.31 Speed restrictions.

(b) *Maryland and Virginia.* The speed limits prescribed by the States of Maryland and Virginia shall constitute the speed restrictions on park roads in areas covered by this part within their respective geographical limits, unless a lesser speed limit is prescribed for a particular road, or section of road, by the posting of official signs.

**3.** § 50.28 Use of liquors; intoxication.

(c) *Driving motor vehicle while intoxicated.* No person who is under the influence of intoxicating liquor or narcotic drugs shall operate or drive a motor vehicle of any kind in any area covered by this part.

veying the remaining evidence, the district court granted the defendant's motion to dismiss Count Two, observing:

> Well, I think there is plenty [of] evidence of excessive speed. I'm not so sure that there is enough evidence of the specific speed of in excess of seventy miles an hour.

### Intoxication—Alcohol

As noted above, the arresting officer detected a "strong odor of alcohol" on the defendant's breath and stated his eyes were "bloodshot and they appeared very glassy." Although the officer testified that the defendant was speaking clearly and coherently, the officer stated he had trouble getting the defendant's attention. The officer who administered the blood-alcohol test also testified that the defendant's speech was not slurred but was very slow, and that the defendant had difficulty maintaining the chain of conversation. Shayestehpour testified on cross-examination that the defendant spoke clearly and that he acted quickly without stumbling in their joint rescue attempts.

The defendant admitted to consuming a beer with his dinner at approximately 6 P.M. the evening before the accident, and approximately two and one-half glasses of wine between 9:30 and 12:30 at a bar in downtown Washington, D. C. The defendant also testified that he stopped on his way home for a cup of cappuccino and a quiche at approximately 1:30 A.M. A pathologist who testified for the government as an expert physician estimated that in order to reach a blood-alcohol level of .07%, the level of the defendant's blood when tested after the accident, a person of roughly the defendant's weight would have to ingest approximately three or four drinks, each equivalent to a twelve ounce bottle of beer or one ounce of whiskey or other fortified spirits, in the hour preceding the test.

### Intoxication-Marijuana

Officer Feltham testified that when he seized the cannister, later determined to contain a small quantity of marijuana, from the defendant incident to his arrest, the defendant "grinned" at the officer and said

"there isn't much left, I smoked the rest." On cross-examination Officer Feltham recalled no statement as to when the defendant had smoked "the rest"; the defendant denied saying anything about smoking the contents, and while admitting to smoking marijuana on other occasions, denied smoking any on the evening of the accident. Traces of marijuana, a pipe, a hemostat, and other paraphernalia were found in defendant's car, and defendant admitted that he had on occasion smoked marijuana in the car. However, the officer who conducted the search and seizure of items in the interior of the car shortly after the accident testified that he did not remember smelling anything in the car. The officer who conducted the blood-alcohol test testified that the defendant told him he was returning from a party; defendant denied making such a statement and denied that he was returning from a party.

The guidelines for reviewing the sufficiency of evidence to support a conviction are quite familiar. The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt. *United States v. Shaver*, 651 F.2d 236, 238 (4th Cir. 1981), citing, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Sherman*, 421 F.2d 198, 199–200 (4th Cir.), cert. denied, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established. *Holloway v. McElroy*, 632 F.2d 605, 641 (5th Cir. 1980), cert. denied, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981); *United States v. Grow*, 394 F.2d 182, 201 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968). Where there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evidence and judge the credibility of the witnesses. *United States v. Fisher*, 484 F.2d 868, 869–70 (4th Cir. 1973), cert. de-

*nied,* 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974).

■ With these principles in mind, we conclude that there is evidence from which the jury could reasonably have concluded that the requisite elements of the federal manslaughter statute were satisfied. Any reservations we might express concerning the evidence, for the most part, are matters the resolution of which would involve weighing conflicting evidence and assessing credibility of witnesses. As to alcohol intoxication, the jury was instructed that, to find the defendant was violating 36 C.F.R. § 50.28(c), it must be shown beyond a reasonable doubt that the defendant was under the influence of alcohol to such an extent that his ability to drive with safety to himself and others was materially impaired. The jury was also instructed as to the specific statutory presumptions concerning intoxication in the Commonwealth of Virginia: A person with a blood-alcohol level of less than .05% is presumed not to be under the influence of intoxicants; a blood-alcohol level of .10% or greater gives rise to a presumption that the person is under the influence of intoxicants; and for the middle range in which the defendant's measurement of .07% lies, no presumption arises but such facts may be considered in conjunction with other evidence in determining whether or not the person is under the influence of intoxicants. Va.Code § 18.2–269 (Michie 1975).

Where a mid-range blood-alcohol level is not corroborated by any other substantial evidence, *see Mulling v. State,* 156 Ga.App. 404, 274 S.E.2d 770 (1980), or the blood-alcohol test is not sufficiently contemporaneous with the time of an accident, *see United States v. Dubois,* 645 F.2d 642 (8th Cir. 1981), a finding of intoxication is unlikely to stand. Similarly, in civil context, courts have expressed doubt whether the odor of alcohol on the breath, or even an admission that a party has been drinking, standing alone, would support such a finding. *See Miles v. Ryan,* 484 F.2d 1255, 1258 n.6 (3d Cir. 1973); *Jarrell v. Ford Motor Co.,* 327 F.2d 233, 235 (4th Cir. 1964). However, where the defendant has admitted consuming at least some alcohol, an arresting officer forms a belief from personal observation that the defendant is intoxicated, and the defendant's blood-alcohol, when tested after the passage of some period of time, registers between .05 and .10%, we cannot say that any reasonable factfinder would be precluded from finding the defendant was driving under the influence of alcohol. *Cf. United States v. Hughes,* 542 F.2d 246 (5th Cir. 1976); *United States v. Eubanks,* 435 F.2d 1261 (4th Cir. 1971); *United States v. Fletcher,* 344 F.Supp. 332 (E.D.Va.1972).

We do entertain serious doubt, however, whether the evidence would have supported an independent finding of intoxication by a self-administered drug, marijuana. The court instructed the jury as to intoxication by marijuana in the same phrase as intoxication by alcohol, that is, that the government must show that the defendant was under the influence of a drug to the extent that his ability to drive with safety to himself and others was materially impaired. Additionally, the court gave a precautionary instruction that the defendant's possession of marijuana and the seizure of paraphernalia from his car was to be considered only to the extent it indicated whether defendant had committed the unlawful act of driving under the influence of marijuana. Such a conclusion would be highly speculative under the circumstances proved here.

The court did not give specific guidelines to the jury on how to evaluate the evidence relating to speed, but simply stated that while the speeding charge (Count Two) was not being submitted, there remained the element of the involuntary manslaughter charge relating to speeding. In its earlier comments outside the hearing of the jury, the court explained its decision to exclude expert conclusions as to specific speed on the ground, in part, that given the distance measurements the jury could draw the same conclusions as to whether defendant's speed was excessive. *But cf. Bonner v. Polcari,* 350 F.2d 493, 495–96 (10th Cir. 1965). We conclude that from the eyewitness testimony of Shayestehpour, and the physical evidence concerning the movements of the cars during the accident, together with permissible inferences from this evidence, there was sufficient evidence

from which the jury could have found that the defendant's speed was excessive.

Even if we were to conclude that the evidence of driving under the influence of alcohol or at excessive speed would not substantially support independent findings that the defendant committed unlawful acts not amounting to felonies within the meaning of § 1112, such evidence could still, in light of all the circumstances, be deemed to constitute gross, criminal negligence. *See United States v. Escamilla*, 467 F.2d 341, 347 (4th Cir. 1972); *Beck v. Commonwealth*, 216 Va. 1, 4, 216 S.E.2d 8, 10 (1975). The district court instructed that gross negligence required a finding of wanton and reckless disregard for human life, and also that the defendant had actual knowledge that his conduct was a threat to the lives of others, or knowledge of "circumstances as could be said to have made foreseeable to him the peril to which his acts might subject others." This instruction was required by and is in accordance with *United States v. Pardee*, 368 F.2d 368 (4th Cir. 1966); *see also United States v. Keith*, 605 F.2d 462, 463 (9th Cir. 1979). Such circumstances in this case would include the time of night, the defendant's admitted consumption of alcohol and the inferences of speed and caution or the lack thereof that can be reasonably drawn from the facts developed at trial, particularly the time and distance in which the defendant apparently had the opportunity to notice and avoid the stationary Toyota. The jury was properly charged. It is clear that the evidence presented a jury question at least as to this aspect of involuntary manslaughter, and the verdict is supported by adequate evidence on this ground. *See Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970).

AFFIRMED.

JAMES DICKSON PHILLIPS, Circuit Judge, concurring:

The majority holds, and I agree, that there was insufficient evidence to convict defendant of manslaughter on the basis that his violation of the misdemeanor offense involving marijuana use was the cause of the fatal accident. Because I think that on the particular factual circumstances and procedural posture of this case it is possible to say with adequate assurance that this was not the sole basis for the verdict, and because the verdict was both factually and legally supportable on each of the other discrete alternative means of commission submitted to the jury, I concur in the judgment of affirmance.

To the extent the majority opinion suggests that in any and all circumstances a general verdict of guilty returned on a disjunctive submission of alternative factual means of commission is saved if any one of the means is adequately supported by evidence, *see* at p. 1023, I disassociate myself from the opinion. I think whether it does or does not depends upon the circumstances and that in some circumstances a factually unsupported alternative theory of means must vitiate a general verdict just as a legally erroneous alternative theory of means assuredly does. *See Yates v. United States*, 354 U.S. 298, 311–332, 77 S.Ct. 1064, 1072–1084, 1 L.Ed.2d 1356 (1957); *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1930); *United States v. Head*, 641 F.2d 174, 178–79 (4th Cir. 1981). I see no universally applicable distinction for this purpose between a general verdict possibly based upon a "legally" erroneous means of commission and one possibly based upon a means not supported, "as a matter of law," by sufficient evidence. Although this circuit has apparently not had occasion to address the issue directly, other circuits have drawn no such distinction in cases similar to this one. *See, e.g., United States v. Tarnapol*, 561 F.2d 466, 475 (3d Cir. 1977); *United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975); *cf. United States v. Stirling*, 571 F.2d 708, 725–26 (2d Cir. 1978); *but see United States v. Halbert*, 640 F.2d 1000, 1008 (9th Cir. 1981) (*contra*: making the general distinction). The Supreme Court may be thought not to have ruled definitively on the point, but the best indication to me from its decisions is that it considers that in some circumstances a general verdict of guilty may be vitiated by the ambiguity resulting from the disjunctive submission to the jury of a number of discrete alternative factual means of

committing an offense at least one of which is insufficiently supported by evidence to justify its submission. *See Boilermakers v. Hardeman*, 401 U.S. 233, 247 & 252, 91 S.Ct. 609, 617 & 620, 28 L.Ed.2d 10 (1970) (White, J., concurring, and Douglas, J., dissenting); *Haupt v. United States*, 330 U.S. 631, 641 n.1, 67 S.Ct. 874, 878 n.1, 91 L.Ed. 1145 (1946); *Cramer v. United States*, 325 U.S. 1, 36 n.45, 65 S.Ct. 918, 935 n.45, 89 L.Ed. 1441 (1944). I read *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), cited by the majority without elaboration, as an example of the sort of special circumstance also present in the instant case where the possible ambiguity of the general verdict is fairly dispelled by a practical assessment of the record. I do not read it to stand for any general proposition that an unsupported factual means of commission, unlike an erroneous legal one, is always cured by an adequately supported alternative theory upon which a general verdict of guilty *may* have been based.

Only because I am convinced, after review of the record, that the jury here could not conceivably have based its general verdict solely on the grounds of the insufficiently proved marijuana offense do I concur.