UNITED STATES of America, Appellee,

v.

Kyle JONES, Appellant.

UNITED STATES of America, Appellee,

v.

Gary NEIL, Appellant.

Nos. 83–5181, 83–5182.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 13, 1984.

Decided June 1, 1984.

786

James D. McQueen, Jr., Huntington, W.Va. (W. Nicholas Reynolds, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.Va., on brief), for appellant Gary Neil.

John A. Rollins, Charleston, W.Va. (Arthur T. Ciccarello, Brickford Y. Brown, Lewis, Ciccarello, Masinter & Friedberg,

Charleston, W.Va., on brief), for appellant Kyle Jones.

Michael W. Carey, Asst. U.S. Atty., Charleston, W.Va. (David A. Faber, U.S. Atty., Marye L. Wright, Asst. U.S. Atty., Charleston, W.Va., on brief), for appellee.

Before RUSSELL and ERVIN, Circuit Judges; and MAX ROSENN, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

ROSENN, Senior Circuit Judge.

On November 7, 1980, an explosion at a coal mine operated by the Westmoreland Coal Company in Boone County, West Virginia killed five miners. Following an investigation, Kyle Jones, the mine superintendent, and Gary Neil, the night shift supervisor, were indicted in the United States District Court for the Southern District of West Virginia. They were jointly tried to a jury and convicted of violations of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801–960 (1982).[1] The defendants appeal their convictions. We affirm.

## I. Background

In response to the serious dangers to workers' health and safety engendered by the recurring catastrophes in the nation's coal mines, Congress enacted the Federal Coal Mine Health and Safety Act of 1969 (CMHSA), Pub.L. No. 91–173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 801–960 (1976)).[2] In so doing, Congress declared, inter alia, that "the first priority

and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner." 30 U.S.C. § 801 (1982). The CMHSA was broad in scope; it extended to virtually every coal mine in the United States and established rigorous health and safety standards. Several years later, Congress amended the CMHSA and redesignated it as the Federal Mine Safety and Health Amendments Act of 1977 (Act).

Section 303 of the Act provides for detailed safety and examination requirements for underground mines. Before miners enter the active workings of a coal mine for a work shift, a certified person must thoroughly examine every working section and test for accumulations of methane, a highly inflammable gas, and for oxygen deficiency. A similar examination must be performed at least once during each coal-producing shift. Within three hours prior to miners entering idle and abandoned areas of the mine, inspections must be made of these areas for oxygen deficiencies, methane, and other dangerous conditions. In addition, the Act requires weekly examinations of at least one entry of each main intake and return aircourse in its entirety. The examiner must record the results in a book open for inspection to interested persons. The mine superintendent or the assistant superintendent must read and countersign the daily and weekly reports.

The evidence produced at trial revealed a variety of safety violations at the Ferrell No. 17 mine, the site of the explosion. Violations of the Act's examination require-

---

1. Jones and Neil were convicted under 30 U.S.C. § 820(c) (1982) as agents of corporate coal mine operators who "knowingly authorized, ordered, or carried out" violations of the safety standards. Jones was held criminally liable for his role in (1) the movement of a power center while energized, in violation of 30 U.S.C. § 868(m) (1982) (count II), (2) the failure to conduct adequate weekly examinations, in violation of 30 U.S.C. § 863(f) (1982) (count V), and (3) the failure to conduct a weekly examination of the 1 East and 2 South areas of the mine commencing the week of October 20, 1980, also in violation of 30 U.S.C. § 863(f) (1982) (count III). Neil was convicted for his role in causing miners to enter uninspected idle areas, in viola-

tion of 30 U.S.C. § 863(m) (1982) (counts IX and XIII). They were acquitted on other related counts.

2. The immediate disaster that became the catalyst for the 1969 legislation was a mine explosion that killed 78 men at the Consolidation Coal Company's No. 9 mine at Farmington, West Virginia, on November 20, 1968. Senate Comm. on Labor and Public Welfare, Sen.Rep. No. 411, 91st Cong., 1st Sess. 6 (1969), reprinted in Legislative History of the Federal Coal Mine Health and Safety Act of 1969 including Black Lung Amendments of 1972, at 132 (1975).

ments were commonplace.[3] Apparently, the practice in the mine was not to examine entryways in nonworking areas, even if miners were to travel in these idle areas. During the weekly examinations, foremen would ride a personnel carrier up a track entry, stop periodically at mandoors, and peer through them instead of examining the entire length of the aircourse as required by the Act. Foremen testified that they would falsely note in the book that they had made a proper examination, and stated that mine supervisors were aware of this practice. Another impropriety was the movement of a power center while in the mine in an energized state. Moving a power center while energized creates a serious danger of electrical shock.

At the time of the explosion, defendant Kyle Jones was the superintendent in charge of the mine. His immediate subordinates were a general mine foreman and three shift supervisors. Defendant Gary Neil was the shift supervisor in charge when the explosion occurred.

On appeal, the defendants challenge their convictions on several grounds. They assert that an instruction to the jury allowed them to be convicted under a lesser standard of culpability than that mandated by the Act. The defendants also claim that there is insufficient evidence to support the guilty verdicts. Finally, they maintain that their convictions must be reversed because the Act is unconstitutional.

## II. The Jury Instruction

In enacting the CMHSA in 1969, Congress recognized that strict civil and criminal penalties for violations were necessary to ensure that the health and safety standards were met. Congress also realized that it might be unfair and ineffective to place sole responsibility for violation of the standards on either the operators of mines or on their agents who had personally authorized the violations. See H.R.Rep. No. 563, 91st Cong., 1st Sess., reprinted in 1969 U.S.Code Cong. & Ad.News 2503, 2513–14. Therefore, Congress expressly imposed civil and criminal penalties on both mine operators and agents of corporate mine operators.

Section 819 enumerated penalties and enforcement procedures for violations of the mandatory health or safety standards. An operator of a coal mine in which a violation occurred was subject to a civil penalty; an operator who "willfully" violated a standard was subject to a criminal penalty. Thus, Congress established a strict liability standard to assess civil liability and a willful standard to fix criminal liability against operators. An agent of a corporate operator who "knowingly authorized, ordered, or carried out" a violation was subject to civil and criminal penalties. Therefore, Congress mandated a knowing standard to assess both civil and criminal liability against corporate agents.[4]

When Congress amended the CMHSA in 1977, it sought to strengthen the statute by providing for better enforcement procedures. Although Congress redrafted the penalty section, it did not change the culpability standards. Section 820 of the Act currently provides for civil and criminal penalties for violations of the health and safety requirements.[5]

---

**3.** In addition to these defendants, other supervisors and the Westmoreland Coal Company were charged with various violations of the Federal Mine Safety and Health Act of 1977. Westmoreland Coal Company entered into a plea agreement to a thirteen count indictment and agree to pay more than one million dollars in fines and contributions. The general mine foreman, the day shift supervisor, and the evening shift supervisor also pled guilty.

**4.** The Sixth Circuit recognized this distinction between the standards for operators and agents in *United States v. Consolidation Coal Co.*, 504 F.2d 1330 (6th Cir.1974). The court tested the

operator's conviction under a willful standard and the agent's conviction under a knowing standard.

**5.** 30 U.S.C. § 820 (1982) states in pertinent part:
 **(c) Liability of corporate directors, officers, and agents**
 Whenever a corporate operator violates a mandatory health or safety standard ... any director, officer, or agent of such corporation who knowingly authorized, ordered, or carried out such violation, failure, or refusal shall be subject to the.same civil penalties, fines, and imprisonment that may be imposed

Under section 820(c) of the Act, the standard of culpability for a corporate agent is whether the agent "knowingly authorized, ordered, or carried out" a violation of the health or safety standards. The counts of the indictment on which the defendants Jones and Neil were convicted, however, charged that they "willfully" violated a mandatory safety standard. The court informed the jury that it may convict if the jury found that the defendants had acted "willfully." To gauge the adequacy of the instruction, we must determine whether it allowed the jury to convict the defendants under a lesser standard of culpability than that set forth in the Act.

The court instructed the jury that "[a] violation of a safety standard is done willfully if it is done knowingly, purposely and voluntarily ... and requires an affirmative act either of commission or omission, not merely the careless omission of a duty."[6] A well-accepted definition of "knowingly" is "[a]n act ... done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 14.04 (3d ed. 1977). The district court in this case specifically included references to voluntary and intentional conduct in its instruction, although it did not include the explanatory statement in the foregoing definition pertaining to "mistake or accident or other innocent reason." When, however, one looks at the complete instruction on willfulness, it is evident that accidental, mistaken, or other innocent acts are excluded. We believe that the standard applied by the court, though couched in terms of willful conduct, set a level of behavior at least as culpable as that required to convict for knowing conduct in violation of the Act.

In *United States v. Illinois Central Railroad*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938), the Supreme Court described willful conduct as "that which is 'intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize 'conduct marked by careless disregard whether or not one has the right so to act.'" *Id.* at 242–43, 58 S.Ct. at 535 (quoting *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933)). The trial court here also included in its charge the statement that the defendants' violation must be "either in intentional disobedience of the [safety] standard or in reckless disregard of its requirements." This language conforms to the interpretations of willfulness provided by several of the circuits. In *Consolidation Coal, supra*, at 1335, the Sixth Circuit suggested an instruction almost identical to the one provided in the present case. This court, in interpreting OSHA regulations, has used similar language to categorize a willful violation. *See Intercounty Construction Co. v. Occupational Safety and Health Review Commission,* 522 F.2d 777, 780 (4th Cir.1975).[7]

upon a person under subsections (a) and (d) of this section.

**(d) Criminal penalties**
Any operator who willfully violates a mandatory health or safety standard ... shall, upon conviction, be punished by a fine of not more than $25,000, or by imprisonment for not more than one year, or by both ....

**6.** At trial, the court instructed the jury:
A violation of a safety standard is done willfully if it is done knowingly, purposely and voluntarily either in intentional disobedience of the standard or in reckless disregard of its requirements. Reckless disregard means the closing of the eyes to or deliberate indifference toward the requirements of a mandatory safety standard, which standard the defendant should have known and had reason to know at the time of the violation. The term willful-

ly requires an affirmative act either of commission or omission, not merely the careless omission of a duty.
This instruction was substantially similar to the one proposed by the Sixth Circuit in *Consolidation Coal, supra.*

**7.** Other circuits also have adopted this definition. *See, e.g., Schonbek & Co., Inc. v. Donovan,* 646 F.2d 799, 800 (2nd Cir.1981) (per curiam); *Babcock & Wilcox Co. v. OSHRC,* 622 F.2d 1160, 1167 (3rd Cir.1980); *National Steel & Shipbuilding Co. v. OSHRC,* 607 F.2d 311, 313–16 (9th Cir.1979); *Georgia Elec. Co. v. Marshall,* 595 F.2d 309, 318 (5th Cir.1979); *Kent Nowlin Constr. Co. v. OSHRC,* 593 F.2d 368, 372 (10th Cir.1979); *Cedar Constr. Co. v. OSHRC,* 587 F.2d 1303, 1305 (D.C.Cir.1979) (per curiam); *Empire-Detroit Steel Div. v. OSHRC,* 579 F.2d 378, 384–

The trial court in the case *sub judice* augmented the instruction by providing a definition of reckless disregard: "Reckless disregard means the closing of the eyes to or deliberate indifference toward the requirements of a mandatory safety standard, which standard the defendant should have known and had reason to know at the time of the violation." This well-accepted definition adequately conveys the meaning of the term "reckless disregard." *See, e.g., United States v. Gullett,* 713 F.2d 1203, 1212 (6th Cir.1983).

■ The defendants further assert that the court's instruction allowed the jury to convict them without finding that they had knowledge of the terms of the safety standard. The defendants do not demonstrate, however, that such a finding is necessary to sustain their convictions. To convict, the prosecution must prove generally only that the defendant knowingly committed the offensive act, not that the defendant knowingly violated the law. *See United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971). *See also United States v. Moore,* 586 F.2d 1029, 1033 (4th Cir.1978).

In *United States v. International Minerals & Chemical Corp., supra,* the Supreme Court interpreted a statute that provided for criminal penalties for whoever "knowingly violated any such [transportation of hazardous waste] regulation." *Id.* at 559, 91 S.Ct. at 1699. The Court "decline[d] to attribute to Congress the inaccurate view that that Act requires proof of knowledge of the law, as well as the facts, and that it intended to endorse that interpretation by retaining the word 'knowingly.'" Id. at 563, 91 S.Ct. at 1701. The Court also found "unwarranted the conclusion that Congress abandoned the general rule and required knowledge of both the facts and the pertinent law before a criminal conviction could be sustained under this Act." *Id.* At least in the area of inherent-

ly dangerous activities, once a person knowingly acts, the person may not escape criminal liability because of ignorance that the offensive conduct violates the law. "[W]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565, 91 S.Ct. at 1701.

Nothing in the Act or its legislative history indicates congressional intent to deviate from the ordinary standard in criminal law that requires the prosecution to prove a knowing performance of a prohibited act rather than a knowing disobedience of the law. To convict, the jury did not need to find that the defendants knew the law's requirements. We conclude that the court did not err in its instruction to the jury.

### III. Sufficiency of the Evidence

■ The defendants also assert that there was insufficient evidence to support their convictions. We have already alluded to the specific offenses for which the jury convicted the defendants and we will not reiterate them. *See supra* note 1. We must uphold the verdicts if there is substantial evidence, viewed in the light most favorable to the Government, to support them. *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). *See United States v. Steed,* 674 F.2d 284, 286 (4th Cir.1982) (en banc).

■ As superintendent of the mine, Jones was the on-site manager in charge of its overall operation. At trial, the Government produced ample evidence that Jones ordered the power center moved, and that it was moved while energized. (Count II). Jones strenuously contends that he did not knowingly authorize the movement of the power center in an energized state. Jones personally observed, however, the power center in the mine while it was stopped

85 (6th Cir.1978); *Western Waterproofing Co., Inc. v. Marshall,* 576 F.2d 139, 143 (8th Cir.), *cert. denied,* 439 U.S. 965, 99 S.Ct. 452, 58

L.Ed.2d 423 (1978); *F.X. Messina Constr. Corp. v. OSHRC,* 505 F.2d 701, 702 (1st Cir.1974).

temporarily in transit. The Government introduced evidence from which the jury reasonably could have concluded that when Jones saw the configuration of the power center and the moving equipment, it would have been impossible for him to conclude that the power center was being moved in other than an energized state. Further, two miners who were present at the scene testified that were they to stand in the area where Jones stood, it would be apparent to them that the power center was being moved in an energized condition. When he observed the power center, Jones did not order the machine deenergized or halt its transfer; instead, he encouraged the movement to continue at a more rapid rate. From this evidence, a jury reasonably could have concluded that Jones willfully caused the violation.

The Government also produced evidence that the required weekly examinations of the mines were not being performed or were being performed significantly below the required standards. The Government asserted that Jones and the general mine foreman willfully caused superficial examinations rather than the careful ones mandated by the Act. (Count V). They allegedly permitted foremen to ride in personnel carriers up the track entries and to look through the mandoors instead of requiring them to examine the intake and return aircourse in its entirety. Further, the indictment charged Jones with "requiring those persons assigned to make the weekly examinations to perform many other duties which prevented them from adequately making the examination on the shift they were assigned ...."

At trial, section foremen testified to the illegal practices at the mine and stated that Jones knew about the improper examinations. There was also testimony that when he was told by one of the foremen that they did not have sufficient time to do the examinations, Jones casually dismissed the complaint with a statement that he (Jones) could do them "in four hours and sleep four hours." The evidence presented was sufficient to support a conclusion by the jury that Jones willfully caused the failure to conduct adequate weekly safety examinations at the mine.

The question of whether there was sufficient evidence to convict Jones of willfully causing a failure to conduct a weekly examination of the 1 East and 2 South areas of the mine during the week commencing October 20 is more difficult. (Count III). We are troubled by the absence of direct evidence that there was no examination of this specific section of the mine during this particular week, or that Jones knew that none was performed. Our standard of review, however, is limited. *United States v. Bice-Bey*, 701 F.2d 1086, 1090 (4th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 126, 78 L.Ed.2d 123 (1983). The Supreme Court has stated that an appellate court's reversal of a conviction on grounds of insufficient evidence should be "confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). This court has emphasized that "[t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Further, "[w]e must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *Id.*

At trial, the Government introduced the mine's examination book as an exhibit. Following an examination, the law requires that the examiner enter the observations in the safety book. The book showed that there was no record of a safety examination for the areas during the period in question or during several previous weeks. There was testimony that if examinations were indeed performed they were recorded, as well as testimony that Jones reviewed the book as required by law. Upon consideration of the evidence presented, we conclude that a jury reasonably could have

drawn the inferences necessary to find Jones guilty on this count beyond a reasonable doubt.

Neil, too, challenges the sufficiency of the evidence produced to convict him. As the night supervisor, Neil was in charge of the miners' work during his shift. Neil was convicted of willfully failing to have an inspection prior to causing miners to enter into idle areas of the mine. (Counts IX and XIII). His argument on appeal is based primarily on the assertion that he was inexperienced and that the Government failed to prove that he knew that it was a violation of the law to send miners into the areas without causing a prior safety inspection. Neil testified that his recent promotion to night shift foreman raised serious questions in his mind about his ability to perform this important job without additional training. Indeed, the heart of his defense was that he was unaware of the safety regulations and ill-prepared for his position. The Government, however, was not required to prove that Neil knew the statutory safety requirements. It only needed to demonstrate that Neil had willfully caused miners to enter the areas when there had not been a prior safety inspection.

Neil argues that to uphold the conviction the court would have to improperly construe the Act as a strict liability statute. This contention is incorrect. *See United States v. International Minerals & Chemical Corp., supra,* 402 U.S. at 560, 91 S.Ct. at 1699. If Neil mistakenly thought that when he authorized a task the miners would not be required to enter an idle area of the mine, he could not be convicted under the Act if for some unexpected reason they did so. Nor could he be convicted if he knew that they were entering an idle area of the mine, but he erroneously believed that the area had been inspected. The Act requires proof that Neil acted knowingly when he sent the men into an uninspected area. Although coal mining is a hazardous industry, the Act imposes "strict liability" only to the extent that, when one acts in violation of a law, ignorance of the law is no excuse. We are persuaded that there was sufficient evidence presented to support Neil's conviction for willfully violating this mandatory safety standard.

## IV. Constitutionality of the Act

■ The defendants challenge the constitutionality of the statute on several grounds. First, they assert that it violates the equal protection guarantee of the fifth amendment[8] by holding liable agents of corporate operators but not punishing agents of noncorporate operators. The defendants concede that corporate agents do not constitute a suspect classification for equal protection analysis. The Act, therefore, must be upheld if it bears "some rational relationship to a legitimate [governmental] end." *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) (citing *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961)). *See Richardson v. Secretary of Labor,* 689 F.2d 632, 633 (6th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2088, 77 L.Ed.2d 299 (1983).[9]

---

**8.** Because the defendants challenge federal rather than state action, they claim protection under the fifth amendment, not the fourteenth amendment. This distinction, however, is without significance in this case. "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) (per curiam).

**9.** In a civil context, the court in *Richardson, supra,* upholding the constitutionality of the Act in the case *sub judice,* considered the issue of whether the Act discriminated against corporate agents and concluded that it did not. The court stated:

> In a noncorporate structure, the sole proprietor or partners are personally liable as "operators" for violations; they cannot pass off these penalties as a cost of doing business as a corporation can. Therefore, the noncorporate operator has a greater incentive to make certain that his employees do not violate mandatory health or safety standards than does the corporate operator. Subsection 819(c) [now 820(c)] attempts to correct this imbalance by giving the corporate employee a direct incentive to comply with the Act. *See Cowin & Co. v. Federal Mine Safety & Health Review Commission,* 612 F.2d 838, 840 (4th Cir.1979).
>
> *Id.* at 633–34.

Congress may have believed that in a noncorporate coal mining operation the threat of criminal sanctions against the operator personally would provide a sufficient incentive to comply with the mandatory safety standards. By contrast, in a corporate mining operation, those who are in control might well be insulated from criminal responsibility, the corporation being an impersonal legal entity. There is therefore a rational reason for imposing criminal sanctions upon the officers, directors, or agents who knowingly authorize, order, or carry out safety violations. It is they who are the decision-makers responsible for the commission of the unlawful acts of the corporate operators. *See Richardson, supra,* at 633.[10]

In addition, the largest coal mines in the country tend to be owned and operated by corporate entities. In handling an issue, Congress "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). Congress may have believed that the problems at the corporate mines posed the gravest immediate threat to coal miners and decided to impose personal liability on agents at these mines. A noncorporate operator may not only have a greater incentive to ensure compliance but may also have a greater ability to do so because of the smaller size and generally less diffuse managerial authority of noncorporate operations.

The Supreme Court has recognized that under a "rational relationship" test, the "inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative test and an unavoidable one." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam). We cannot conclude that the decision by Congress to hold corporate agents personally liable for violations of health and safety standards bears no rational relationship to a legitimate governmental interest. We therefore hold that the statutory distinction between corporate and noncorporate agents does not violate the equal protection guarantee.

■ The defendants also claim that the Act discriminates against agents of corporate operators and thereby violates the equal protection guarantee because "an agent of an operator could be convicted on a lesser standard of proof than that required to convict his corporate employer." The basis of this assertion is that under section 820(c) agents are subject to prosecution for a knowing authorization or carrying out of a safety violation whereas operators under section 820(d) are held to a willful standard. In the circumstances we have here, however, this argument is academic and we need not explore it. Although the Government might have charged the defendants under the knowing standard of section 820(c), it deliberately chose to charge them under the willful standard of section 820(d). The defendants therefore cannot complain that they were subjected to a discriminatory standard. Furthermore, Congress might have decided that agents who personally commit a violation should be punished more readily than an impersonal corporate entity.

■ Finally, the defendants argue that the statute is unconstitutionally vague. The statute subjects an agent to prosecu-

---

**10.** It may be that certain agents of noncorporate mining operators are also subject to criminal sanctions in light of the statutory definition of "operator" in section 802(d) of the Act. Under that definition, "operator" includes "any ... other person who operates, controls or supervises a coal ... mine." This language could be read to equate a supervising employee of a noncorporate owner with an "agent" as defined in section 802(e), which means "any person charged with responsibility for the operation of all or a part of a coal ... mine or the supervision of the miners in a coal ... mine." *See Cowin & Co., Inc. v. Fed. Mine Safety and Health Review Comm'n,* 694 F.2d 966, 967–68 (4th Cir.1982) (independent contractor held to be an "operator" under the Act); *Association of Bituminous Contractors, Inc. v. Andrus,* 581 F.2d 853, 861–63 (D.C.Cir.1978) (the statutory term "operator" may include persons other than owners and lessees). Under this reasoning, an "agent" of a noncorporate operator could be subject to criminal prosecution under section 820(d).

tion upon knowingly authorizing, ordering, or carrying out a violation of a mandatory safety standard. The defendants maintain that the Act impermissibly "leaves one uncertain as to whether a mere ommission [sic] to comply with the requirements of the Act is sufficient to establish criminal liability." They also claim that the statutory definition of the term "agent" as "any person charged with responsibility for the operation of all or a part of a coal ... mine," 30 U.S.C. § 802(e) (1982), improperly allows an operator to determine who may be liable under the statute through the assignment of duties at the mine.

The Supreme Court has ruled that criminal statutes that are vague offend due process "because we assume that man is free to steer between lawful and unlawful conduct, [and] we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). *See Hirschkop v. Snead,* 594 F.2d 356, 370–71 (4th Cir.1979) (en banc) (per curiam). The Federal Mine Safety and Health Act of 1977, however, provides "fair warning" to potential violators. The Supreme Court has held that one may act "knowingly and willfully" by failing to perform a duty as well as by performing one. *See Illinois Central Railroad, supra,* 303 U.S. at 244, 58 S.Ct. at 535. The statutory use of the term "knowingly" does not unconstitutionally fail to warn violators that they may be punished for acts of omission as well as of commission.

We also hold that the definition of the term "agent" is adequate. The Act punishes a person who, having responsibility for the operation of all or part of a mine, knowingly authorizes a violation of a safety standard. A person of ordinary intelligence should have no difficulty in understanding when he has responsibility for the operation of all or part of a coal mine. We reject the defendants' contention that the Act is vague merely because a coal operator may choose which individuals shall have

responsibility over parts of the mine. The possibility that exposure to criminal liability may depend upon the operational chain of responsibility does not create a constitutional infirmity.

V.   Conclusion

Congress has chosen to legislate comprehensive health and safety standards for the coal mining industry and to impose civil and criminal penalties on violators. A person who is charged with the responsibility for the conduct of all or part of a coal mine is also charged under the Act with the responsibility for the health and safety of the miners who work under his supervision. It is vital that this person understand the federal requirements. If he is not familiar with the substance of the safety standards, he not only imperils his subordinates but subjects himself to liability for civil and criminal penalties.

The jury determined that the defendants did not meet their responsibilities under the Act. After carefully reviewing the defendants' contentions, we perceive no reversible error. Accordingly, the convictions are affirmed.