52 F.3d 322
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Francis HAAS, Jr., a/k/a Big Arm Charles, Defendant-Appellant.
 No. 94-5457.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 10, 1995.
Decided: April 19, 1995.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CR-93-139)
 ARGUED: Robert Patrick Geary, Richmond, VA, for Appellant. John Granville Douglas, Assistant United States Attorney, Richmond, VA, for Appellee. ON BRIEF: Helen F. Fahey, United States Attorney, Richmond, VA, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before WILKINSON and NIEMEYER, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Charles F. Haas, Jr. was convicted of a variety of crimes stemming from his involvement in a drug conspiracy. This appeal alleges several errors in his conviction and sentencing, including improper joinder, admission of prejudicial evidence, insufficient evidence to convict, and improper application of the Sentencing Guidelines. We find no error in the proceedings below, and so affirm the conviction and sentence.
 
 I.
 
 2
 In October 1993, Charles Haas and seven other members or associates of the Hell's Angels Outlaw Motorcycle Gang were indicted by a Virginia grand jury on a total of twenty-five counts relating to a drug-dealing and money-laundering conspiracy. The indictment alleged that Haas was a prominent member of the conspiracy, involved in all aspects of a massive drug distribution network. Haas was also charged with possession of a firearm by a convicted felon, use of a firearm in a drug-trafficking offense, possession of methamphetamine with intent to distribute, and attempted manufacture of methamphetamine.
 
 
 3
 The other individuals named in the indictment included Thomas Lewis, Russell Zink, Glenn Yank, Percy Barfield, Joseph Redish, Timothy Humphries, and Sean Gallagher. Also named was a corporate defendant--Gallagher's wholly-owned company Commodity Recycling, Inc. ("CRI"). Lewis was the alleged kingpin of the Hell's Angels' drug operations. Gallagher and his company were alleged to have provided money-laundering services to the cartel, but were not charged under the conspiracy count. The other individuals were charged with various crimes related to the conspiracy's manufacture and distribution of the drugs.
 
 
 4
 Lewis and Zink evaded arrest and so were not available for trial. Yank, Barfield, Redish, and Humphires all entered guilty pleas, leaving Haas, Gallagher, and CRI as the defendants joined for trial. On the eve of trial, Haas filed a motion for severance from his remaining co-defendants. He argued that his only connection to Gallagher and Gallagher's company was through Thomas Lewis, who was not present or involved in the current proceedings. The district court denied the motion, and the case proceeded to trial on February 10, 1994.
 
 
 5
 At trial, the government presented evidence that from at least 1990 to 1993, Haas, a member of the Northern California chapter of the Angels, worked as a partner with Thomas Lewis, a Virginia Hell's Angel, to distribute methamphetamine, cocaine, and marijuana in Virginia, New England, Minnesota, and several Western states. The prosecution also presented evidence that Haas and Lewis attempted to make their own methamphetamine, that they used firearms for "security," and that they acted to silence potential witnesses.
 
 
 6
 The evidence showed that investigators first learned of the conspiracy in June of 1991 when a raid at the Genito Mini-Storage facility in Chesterfield County, Virginia uncovered drug supplies that led them to Tommy's Towing, a business owned by Lewis, and an individual named Darrell Benson. Methamphetamine manufacturing apparatus was found at both Tommy's Towing and Benson's residence. At trial, Mr. Benson testified for the government, stating that Lewis and Haas had a partnership to buy and sell methamphetamine. Haas acquired the drugs from a California supplier and sent them to Lewis in Virginia, where Benson, Percy Barfield, Glenn Yank, and others worked to prepare, store, and sell the drugs. Benson testified that they used Tommy's Towing as a front operation for this drug distribution network in Virginia.
 
 
 7
 Benson also testified that in 1990 and 1991, Haas and Lewis tried to manufacture their own methamphetamine. Benson rented his house to Lewis as a site for a production lab. Lewis then recruited Yank, Russell Zink, and a woman named Shelly Hoke to obtain the glassware and chemicals needed for the operation. In January, 1991, Haas, Lewis, Benson, and Yank gathered at Benson's house to make the methamphetamine. Yank, who also testified for the government, stated that Haas brought certain chemicals needed for the attempt, as well as an AR-15 assault rifle. Haas assumed the role of "security" during the methamphetamine manufacturing process, carrying the assault rifle while he patrolled around the house and grounds. Yank testified that his own job was to conduct the chemical mixing, but that he failed to produce the desired results. Haas and Lewis brought in Joseph Redish to make a second attempt, but that also failed.
 
 
 8
 Lewis and Haas then decided to postpone their efforts, but made plans for future attempts. Benson testified that Lewis directed him to put the chemicals in storage for future use. These chemicals were later discovered by police during the Genito Mini-Storage raid. Lewis also directed Benson to prepare a new list of chemicals needed for methamphetamine manufacture. Police found this list in Haas' possession in March of 1991.
 
 
 9
 During this same time period, Haas and Lewis were also dealing in large quantities of cocaine. Yank testified that in the spring of 1991 he bought three kilograms of cocaine in New York for Lewis, and then delivered it to Haas and Lewis in Virginia. Lewis took one kilo. Haas gave the rest to his "road man," James Aggas, and ordered him to take the drugs to Kentucky to sell. Aggas also frequently made deliveries for Haas in the methamphetamine network. When some trouble arose in paying for the cocaine, Haas traveled to New York with Hoke to meet with Aggas and Yank.
 
 
 10
 After the Genito Mini-Storage raid, Haas and Lewis became concerned that the drug conspiracy was vulnerable to the authorities. Benson testified that they took steps to limit the availability of potential witnesses. For example, when Benson was arrested, Lewis paid his bond, told him to leave Virginia, and arranged a hiding place with Hell's Angels members in Massachusetts. Benson also testified that Lewis later told him that Haas had reported that the "problem" with Shelly Hoke had been "cleaned up." The parties stipulated that Hoke has not been heard from since July of 1991.
 
 
 11
 The exposure of Tommy's Towing as a front after the June 1991 raid also led Lewis to seek new ways to hide his drug profits. Sean Gallagher helped Lewis set up a new front business, Evo-X Corporation. Rebecca Meade, Gallagher's personal accountant and assistant at CRI testified that Gallagher also engaged in a number of payments and loans to Lewis. Gallagher also allegedly helped hide drug profits in some real estate transactions in 1991 and 1992.
 
 
 12
 Based on this evidence, the jury found all defendants guilty on all counts. Haas' sentencing hearing was held on May 31, 1994. At this hearing, the district court found Haas was an "organizer or manager" of the conspiracy and so applied a two-level enhancement to the offense level under Guideline Sec. 3B1.1. As a result, Haas was sentenced to 362 months imprisonment. He now appeals his conviction and sentence.
 
 II.
 
 13
 Appellant raises four distinct claims of error with respect to his trial and sentencing.
 
 A.
 
 14
 Haas first attacks the district court's denial of his motion for severance. He notes that he was charged with conspiracy, drug, and firearm charges, whereas his co-defendants were charged with only moneylaundering offenses, and argues that this disjunction in offenses mandated separate trials.
 
 
 15
 We do not agree. Fed.R.Crim.P. Rule 8(b) governs joinder of criminal defendants, providing that:
 
 
 16
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 
 
 17
 A straightforward application of this rule demonstrates that Haas and Gallagher were properly tried together. The indictment in this case alleged that Thomas Lewis was the kingpin of a far-flung drug enterprise. It further alleged that Haas was involved in various drug dealing and drug manufacturing activities for this enterprise, and that Gallagher provided the money-laundering services for this enterprise. Clearly then, Haas and Gallagher were involved in "the same series of acts or transactions constituting an offense or offenses." Not only did they share a direct link through Lewis, both were involved in the same criminal undertaking, just with different responsibilities within that enterprise. See United States v. Sutherland, 929 F.2d 765, 779 (1st Cir.1991) (drug dealing and financial illegalities arising from those drug dealings are part of the same series of transactions); see also United States v. Perry, 731 F.2d 985, 990 (D.C.Cir.1984) (Rule 8(b) requires only some "logical relationship" between acts or transactions within the series).
 
 
 18
 Nor does it matter that the defendants were charged under different counts of the indictment. As Rule 8(b) states, joined defendants "may be charged in one or more counts together or separately and all of the defendants need not be charged in each count." Fed.R.Crim.P. 8(b). Thus, there was no misjoinder in this case.
 
 B.
 
 19
 Haas next challenges the sufficiency of the evidence that he was involved in Lewis' drug conspiracy. He argues that his convictions rested on the "uncorroborated" testimony of co-conspirators because the only corroborating evidence was the list of chemicals found in Haas's possession well after the methamphetamine manufacturing attempts were finished. Haas concedes that such uncorroborated testimony may be sufficient to convict, United States v. Figurski, 545 F.2d 389, 392 (4th Cir.1976), but argues that the testimony of coconspirators Benson and Yank was tainted by their self-interest in minimizing their own roles in the conspiracy.
 
 
 20
 This argument is also devoid of merit. First, mere challenges to the credibility of witness testimony cannot be credited on appeal, as credibility was a question for the jury. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). Defendant had his chance to show bias on the part of the government's witnesses during cross-examination, but obviously failed to convince the jury. No second chance is provided now.
 
 
 21
 Second, there was indeed significant corroborating evidence offered by the prosecution. Physical evidence seized in the June 1991 raid matched Yank and Benson's descriptions of the methamphetamine manufacturing efforts. Telephone and airline records confirmed the defendant's movements during the conspiracy. Finally, notes and lists seized from Lewis, Benson, and Haas linked all three together in the conspiracy.
 
 
 22
 Overall, the evidence was more than sufficient to prove all the counts against Haas. The evidence is assessed in the light most favorable to the government, and the verdict will stand unless no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. United States v. Jones, 735 F.2d 785, 790 (4th Cir.1984). Here, there was essentially uncontroverted testimony by Benson and Yank that Haas was a partner in Lewis' extensive drug operations. This same evidence demonstrated that Haas possessed large quantities of drugs and was attempting to manufacture methamphetamine. There was also clear testimony by Benson indicating that Haas illegally possessed firearms and used them in the course of his involvement in the drug conspiracy, most notably in his use of an AR-15 rifle for "security" purposes. Any rational trier of fact could easily conclude that Haas was guilty as charged.
 
 C.
 
 23
 Appellant also argues that the district court abused its discretion in admitting evidence regarding the disappearance of Shelly Hoke. He contends that testimony regarding Haas' statement that the "problem" with Hoke had been "cleaned up" left a clear impression that Hoke had met with foul play at Haas' hands, and that the unfair prejudicial effect of this evidence substantially outweighed its probative value. See Fed.R.Evid. 403.
 
 
 24
 Under Rule 403, however, the trial court has broad discretion to weigh the balance between prejudice and probative value. United States v. MacDonald, 688 F.2d 224, 227-28 (4th Cir.1982), cert. denied, 459 U.S. 1103 (1983). Here, the district court's determination was within its discretion. Evidence that a defendant has acted to silence potential witnesses to a crime is relevant to show consciousness of guilt. United States v. Reamer, 589 F.2d 769, 770 (4th Cir. 1978). Nor is there any "unfair prejudice" resulting from this evidence. The testimony may have been damaging to the defendant's case, but that is hardly the same thing as unfair prejudice.
 
 D.
 
 25
 Finally, Haas objects to the district court's factual findings underlying its application of the Sentencing Guidelines. Specifically, he contests the district court's finding based on the presentence report that he was an "organizer" of the conspiracy within the meaning of Guideline Sec. 3B1.1. Haas argues that this finding conflicts with the government's evidence that he provided security by patrolling Benson's property during the methamphetamine manufacturing. He contends that it "seems almost ludicrous" that an organizer of the conspiracy would carry out such menial roles as security patrols, and therefore concludes that the trial court's finding must be in error.
 
 
 26
 We do not agree. It can hardly be said that assuming a security role during drug operations negates the possibility that the same individual was a leader of those operations. Moreover, there was abundant evidence at trial that Haas supervised or directed the activities of the conspiracy. Both Benson and Yank testified that it was Haas who organized the methamphetamine manufacturing efforts. Haas also organized many of the methamphetamine and cocaine buys. Finally, the witnesses described Haas as the supervisor of Jim Aggas, who transported drugs under Haas's direction.
 
 
 27
 Factual findings underlying sentencing will not be reversed unless clearly erroneous. United States v. Sheffer, 896 F.2d 842, 846 (4th Cir.1990). In light of the extensive evidence of Haas' managerial status, the findings underlying the Sec. 3B1.1 increase were not erroneous.
 
 III.
 
 28
 For the foregoing reasons, the defendant's convictions and sentence are
 
 
 29
 AFFIRMED.