UNITED STATES of America, Appellee,

v.

Donald Bruce MacDOUGALL, Appellant.

UNITED STATES of America, Appellee,

v.

Kenneth Wayne GUNN, Appellant.

UNITED STATES of America, Appellee,

v.

Cleveland SANDERS, Appellant.

UNITED STATES of America, Appellee,

v.

Michael Lee HARVEY, Appellant.

UNITED STATES of America, Appellee,

v.

Cleveland SANDERS, Appellant.

UNITED STATES of America, Appellee,

v.

Kenneth Wayne GUNN, Appellant.

UNITED STATES of America, Appellee,

v.

Donald Bruce MacDOUGALL, Appellant.

UNITED STATES of America, Appellee,

v.

Michael Lee HARVEY, Appellant.

Nos. 83–5249(L), 83–5250, 83–5251, 83–5255, 84–5048, 84–5065, 84–5066 and 84–5070.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 9, 1985.

Decided May 22, 1986.

John K. Zwerling (J. Flowers Mark, Michael S. Lieberman, Zwerling, Mark, Ginsberg and Lieberman, P.C., Alexandria, Va. on brief), J. Edward Bell, Sumter, S.C., William B. Moffitt (Thomas Rawles Jones, Jr., Leora Kusher; Moffitt & Jones, Alexandria, Va., on brief); Larry G. Turner (Thomas W. Kurrus; Turner, Kurrus & Griscti, P.A., Gainesville, Fla., on brief), for appellants.

John F. DePue, Dept. of Justice, Washington, D.C. (Robert C. Jendron, Asst. U.S. Atty., Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before WINTER, Chief Judge, SPROUSE, Circuit Judge, and BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

SPROUSE, Circuit Judge:

Donald Bruce MacDougall, Kenneth Wayne Gunn, Cleveland Sanders and Michael Harvey appeal their convictions resulting from their involvement in a major drug smuggling and distribution conspiracy which operated along the east coast of the United States for several years. Appellants belonged to one of the three major organizations whose activities are relevant to this appeal. The appellants' organization separately and, on occasion, jointly with one or both of the other organizations imported and distributed large quantities of marijuana and hashish. The three conspiracies cumulatively grossed in excess of one hundred million dollars and involved more than one hundred persons. All four appellants assert that the double jeopardy clause of the federal Constitution bars their prosecution in this case. In addition, they challenge the procedure by which the district court handled their double jeopardy claims and the sufficiency of the evidence

supporting several of their convictions. We affirm the convictions of MacDougall and Sanders; we remand the case of Michael Harvey for further proceedings; and, we reverse one of Gunn's convictions.

The appellants' convictions arose from an indictment in the United States District Court for the District of South Carolina. That indictment is South Carolina indictment number 166 and charged appellants and nineteen co-defendants with conspiracy and substantive controlled substances offenses. The appellants also raise points about several other indictments, principally South Carolina indictment number 165 and indictments number 31–A and 151 from the Eastern District of Virginia. (The indictments are referred to hereinafter by number.) All four appellants were convicted under indictment number 166 of conspiracy to import marijuana and hashish in violation of 21 U.S.C. § 963 (Count One of the indictment). In addition, MacDougall was convicted of conspiracy to distribute the substances in violation of 21 U.S.C. § 846 (Count Two), possession of marijuana with intent to distribute (Count Eight), and importation and possession of hashish with intent to distribute (Counts Thirteen and Fourteen). Sanders was convicted of conspiracy to distribute (Count Two) and importation and possession of hashish with intent to distribute (Counts Twenty-three and Twenty-four). Gunn was convicted of conspiracy to distribute (Count Two), and Harvey of importation of hashish (Count Thirteen).[1]

MacDougall, Sanders and Gunn were also indicted in the District of South Carolina on conspiracy and substantive counts in connection with the prosecution of the participants in another major drug conspiracy.[2] In that indictment, number 165, the charges were either dismissed or disposed of by not guilty verdicts prior to trial in the instant case. The disposition of the 165 indictment charges forms the basis of MacDougall's, Gunn's, and Sanders' challenges to their present convictions on grounds that the prosecution in the instant case violated the constitutional prohibition against double jeopardy. In addition to his double jeopardy challenge, MacDougall attacks the sufficiency of the evidence underlying the convictions of conspiracy to import (Count One), importation of marijuana (Count Thirteen), and possession of marijuana with intent to distribute (Count Eight). Gunn contends that his indictment was the product of prosecutorial vindictiveness, and that there was insufficient evidence to convict him of Count Two, conspiracy to possess marijuana and hashish with intent to distribute. Sanders asserts that there was also insufficient evidence to convict him of conspiracy to import (Count One) and importation of hashish (Count Twenty-three).

Harvey's double jeopardy claim has a different basis. Prior to his indictment in this case, Harvey, pursuant to a plea agreement in a drug conspiracy prosecution in the Eastern District of Virginia, indictment number 31–A, pled guilty to a single sub-

---

**1.** MacDougall received five years incarceration for each of his Count One and Count Two convictions, to run consecutively. For Counts Eight and Thirteen, MacDougall received five years incarceration for each, to run consecutively to each other, but concurrently to Counts One and Two. As to Count Fourteen, MacDougall received five years to run concurrently to Counts One, Two, Eight, and Thirteen, plus twenty years special parole.

Sanders received five years incarceration for each of his Count One and Count Two convictions, to run consecutively, and five years each for Counts Twenty-three and Twenty-four to run concurrently to each other and concurrently to his sentence for Counts One and Two. Sanders also received twenty-five years of special parole.

Gunn received four years incarceration for each of his Count One and Count Two convictions, to run consecutively.

Harvey received three and one-half years incarceration for each of his Count One and Count Thirteen convictions, to run consecutively, and twenty years special parole.

**2.** The original versions of indictment numbers 166 and 165 were handed down on the same day: May 19, 1983. MacDougall, Gunn and Sanders were defendants in the original 165 indictment. MacDougall and Harvey were defendants in the original 166 indictment. Sanders was added in the first superseding indictment in indictment 166. Gunn was added in the second superseding indictment.

stantive count and served six months in the penitentiary. In return for his plea, the United States Attorney for the Eastern District of Virginia agreed not to prosecute Harvey on other drug related charges pending in the Eastern District of Virginia. He contends that the prosecution in the Eastern District of Virginia barred his prosecution in this case on double jeopardy grounds.[3]

All four defendants assert that the district court erred in not allowing the jury to determine the validity of their double jeopardy claims and in denying them a bill of particulars of the charges against them.

Thus, in this appeal we must determine whether: 1) the trial in this case violated the defendants' double jeopardy rights, including whether the trial court correctly ruled that the court and not the jury was to determine the issue of double jeopardy; 2) the district court committed error in the manner in which it caused Michael Harvey's double jeopardy claim to be framed and tried; 3) there was sufficient evidence to sustain all the convictions; and, 4) it erred in denying Gunn's assertion of prosecutorial vindictiveness and appellants' request for a bill of particulars.

The facts underlying the appellants' claims form a complicated pattern because of the size, and duration of and extensive personnel involvement in the drug smuggling and distribution operations and because of the level of cooperation among the organizations. One conspiracy to smuggle and distribute marijuana originated around the campus of the University of South Carolina in 1974. The scheme involved a number of fraternity brothers, their families and friends. Major figures in the drug smuggling operations who attended the University of South Carolina during the period 1970–74, included Leslie Riley, Michael Harvey's brother, Leon (Lee) Harvey, Barry Foy, and Thomas Rhoad. Rhoad and Foy became the leaders of a major east coast drug smuggling conspiracy which generated the charges handed down against MacDougall, Sanders and Gunn in indictment number 165, the other South Carolina prosecution. Leslie Riley and Leon Harvey teamed together in 1977 to form the conspiracy for which the defendants were convicted in this case under indictment 166.[4] The third organization involved in this appeal began when Julian Pernell and Barry Toombs entered into a smuggling and distribution partnership in 1973 in northern Virginia.[5] Pernell testified at the trial in this case that his and Toombs' organization was the largest marijuana and hashish distribution network on the east coast. Working independently and, on occasion, with each other and with the Pernell-Toombs organization, the Rhoad-Foy and Riley-Harvey organizations expanded to undertake dozens of multi-million dollar importation and distribution ventures. By 1983, when the government concluded the investigation of these illegal activities, the participants had created at least three major illicit drug operations involving smuggling and distribution activities from Florida to New England. Many of the smugglers and distributors had worked in more than one organization and the organizations themselves cooperated in numerous joint ventures.

The appellants contend that the level of cooperation demonstrates that there was, in fact, merely a single giant conspiracy for which they have been placed in jeopardy twice. Because we find that the evidence

---

3. Following his indictment in the instant case, Harvey filed a Motion for Enforcement of Plea Agreement in the Eastern District of Virginia alleging that the plea agreement barred the South Carolina charges. The district court ruled that the plea agreement was binding only against the Eastern District of Virginia. Harvey appealed that decision in another appeal decided by this court today, No. 83–5256.

4. Their organization is referred to as the "Riley-Harvey organization" throughout this opinion. In that context, "Harvey" refers to Leon Harvey.

5. Pernell and Toombs were lead defendants in indictment number 151 filed in the Eastern District of Virginia in June 1982. That indictment also charged Leon Harvey with engaging in a continuing criminal enterprise. Pernell and Toombs testified at the appellants' trial, while Leon Harvey had become a fugitive.

established the existence of separate conspiracies, we reject appellants' double jeopardy claims. We further hold that the district court was correct in deciding that double jeopardy claims are to be resolved by the court. We feel, however, that the district court committed reversible error in the manner in which it allowed the jury to be informed of Michael Harvey's double jeopardy defense before the court had decided the issue. Because we remand Harvey's case due to this error, we do not decide the question of whether Harvey's South Carolina prosecution was barred on double jeopardy grounds. We vacate his convictions and remand so that the district court may review its findings with respect to Harvey's double jeopardy claims and consider any motions regarding Harvey's plea agreement referred to it from the Eastern District of Virginia pursuant to the disposition of the pending appeal, No. 83–5256. Should the district court determine that the South Carolina prosecution of Harvey is not barred either on double jeopardy grounds or by the Virginia plea agreement, the government may proceed to retry him.

A proper understanding of our decision requires a chronological review of the events leading up to the appellants' convictions. Again, the four appellants here were convicted in one trial in the district court of South Carolina on indictment number 166. The disposition of the appellants' double jeopardy claims, however, requires us to review not only the facts underlying the offenses for which they were convicted, but also the facts underlying other indictments in both South Carolina (number 165) and the Eastern District of Virginia (numbers 31–A and 151). In 1974, Leslie Riley, lead defendant in number 166, joined with Barry Foy and Thomas Rhoad, lead defendants in number 165, to smuggle a large quantity of marijuana into the United States at Coconut Grove, Florida.[6] Between the summer of 1974 and 1977, Riley was sporadically employed by both the Rhoad-Foy and Pernell-Toombs organiza-

tions as a boat captain. For example, in the fall of 1974, Pernell employed Riley as captain of the "Banana Quit," a boat bringing 900 pounds of marijuana from Jamaica to Marathon Key, Florida. In late 1975, Riley participated with Pernell and Toombs in the importation of 6,000 pounds of Columbian marijuana into Florida. In 1977, Riley and Leon Harvey formed their organization for the purpose of smuggling marijuana. In its initial venture, the partnership joined with Pernell and Toombs to fly 3,600 pounds of marijuana into the United States. The venture ended unsuccessfully in March 1978 with the arrest of the participants in Georgia. The two organizations joined forces again in June 1978 to import marijuana from Columbia to Falmouth, Massachusetts. Toombs agreed to handle the loading, transportation and sale of marijuana; Leon Harvey undertook to arrange a boat, crew and offloading site. Toombs testified that MacDougall helped arrange for the off-load site and escorted Leon Harvey and Toombs to the site where they unloaded approximately 7,000 pounds of marijuana for resale in Virginia.

The Riley-Harvey organization expanded operations in the months which followed its initial ventures with the Pernell-Toombs organization. In the fall of 1978, Leon Harvey and Riley arranged for Christopher Campbell to captain a boat carrying 6,000 pounds of marijuana from Columbia to Buzzards Bay, Massachusetts. Campbell hired Gunn as a crew member for the venture. In September 1978, Leon Harvey, Riley and Foy imported 9,500 pounds of marijuana from Columbia into the United States in the vicinity of McClellanville, South Carolina. The government concedes that this incident, involving the vessel "Straightaway," was a joint venture and charged it as an overt act (number 20) in indictment number 165, although not in number 166.

In another venture sponsored by the Riley-Harvey organization later that year,

---

**6.** These acts were charged as overt act number 1 in indictment 166, and as acts number 4 and 5 in indictment 165.

Gunn served as a crew member on the "Love Affair," a vessel carrying 7,700 pounds of Columbian marijuana. On November 8, 1978, the Coast Guard intercepted the "Love Affair" in the Bahamas, seized the cargo and arrested the crew, including Gunn and Campbell.[7] In January 1979, Leon Harvey and the Pernell-Toombs organization cooperated in the importation of 28,000 pounds of marijuana from the Bahamas into South Carolina. In early 1979, the Riley-Harvey organization offloaded 8,000 pounds of marijuana at Hilton Head, South Carolina. A participant in that operation, George Strickland, identified MacDougall as having participated in the offloading. That summer Riley and Leon Harvey, again using Christopher Campbell's services, imported 7,000 pounds of marijuana from South America to Buzzards Bay, Massachusetts. In June 1979, Leon Harvey and Riley engaged in another joint venture with Pernell-Toombs to import 22,000 pounds of marijuana from Samana Cay in the Bahamas to Virginia. The Riley-Harvey organization in the summer of 1980 imported 7,000 pounds of marijuana at Hilton Head. Later that summer or early that fall, the Riley-Harvey organization, using a boat captained by Pinckney Greene, a member of the Rhoad-Foy organization, imported 10,000 pounds of Columbian marijuana into the United States near Charleston, South Carolina. It also imported two loads of marijuana totaling approximately 16,000 pounds at Hilton Head in October 1980.

In early 1980, the Riley-Harvey organization began planning the importation of large quantities of hashish in a joint venture with the Pernell-Toombs organization. Riley-Harvey arranged for the purchase of the hashish; Pernell-Toombs its distribution. The Rhoad-Foy organization also paid $700,000 in return for a share of the hashish. As part of this operation, Michael

Harvey travelled to Lebanon with money to pay for the hashish. Riley and Leon Harvey hired Campbell to captain a vessel named the "Second Life." Campbell, whom Pernell testified worked for Riley and Leon Harvey, recruited Gunn as a crew member. In June 1980, the 30,000 pound hashish cargo was unloaded at Hilton Head Island. Both MacDougall and Michael Harvey participated in the offloading. In late 1980, the organization imported a 25,000 pound quantity of hashish at Hilton Head aboard the vessel, "LaCativa." Around this time, Riley, Leon Harvey, Pernell and Toombs began planning a joint operation to import up to 100,000 tons of hashish from Lebanon.[8] The operation subsequently involved several vessels, including one captained by Campbell with Gunn as a crew member. The vessels were offloaded at various points along the east coast. One of the vessels, the "Anonymous of RORC," did not reach the east coast until October or November 1981. Its 9,000 pound cargo of hashish was offloaded onto two other boats which subsequently offloaded the hashish at a farm on Edisto Island, South Carolina, belonging to the family of appellant Sanders. Sanders had provided security for the operation. This last venture resulted in the arrest of many of the participants and the effective termination of the large scale smuggling activities of the Riley-Harvey organization.

*Appellants' Double Jeopardy Claims*

Against the background of overlapping acts and personnel, we first consider the contention of MacDougall, Sanders, Gunn and Michael Harvey that their prosecution in this case violated their fifth amendment double jeopardy rights. To reiterate briefly, the basis of their claim is that the earlier prosecution in South Carolina had placed MacDougall, Gunn and Sanders in

---

7. Campbell testified that they were never prosecuted for their roles in this venture which terminated in the Bahamas.

8. The government included this joint venture as an overt act in both indictment 166 and in the Eastern District of Virginia indictment number

151 concerning the Pernell-Toombs organization's activities. Unlike Michael Harvey, MacDougall, Gunn, and Sanders were not charged in either indictment number 151 or 31, and thus were not placed in jeopardy by any prosecution in the Eastern District of Virginia.

jeopardy and that Michael Harvey's prosecution ending in his guilty plea in the Eastern District of Virginia barred his prosecution in this case. Before reaching the merits of those claims, however, we address their contention that the district court erred in refusing to allow the jury to consider the affirmative defense of double jeopardy. This contention is incorrect, and we affirm the district court's determination that it was for the court to decide the double jeopardy issue.

█ The appellants' double jeopardy claims did not implicate the issue of appellants' guilt or innocence, which a jury must decide, but rather the right of the government to bring the action itself. Guilt or innocence is immaterial to the disposition of double jeopardy claims. The only question is whether the defendant has been previously placed in jeopardy for the offense alleged in the instant indictment. *United States v. H.E. Koontz Creamery, Inc.*, 232 F.Supp. 312, 315–16 (D.Md.1964). *See United States v. Stricklin*, 591 F.2d 1112, 1119 (5th Cir.) (determination of double jeopardy claims best made by court and not by jury; court may vacate pretrial ruling of no prior jeopardy if evidence developed at trial shows there was former jeopardy), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir.1973) (distinction between the determination of guilt or innocence which a jury must make and preliminary matters concerning right of the court to conduct the trial which the court alone may decide); 1 Wright *Federal Practice and Procedure, Criminal 2d*, § 194, at 715 (1982) (little case law on this issue; "what there is distinguishes between the issue of guilt and innocence, for which a

jury is required, and issues affecting the government's right to prosecute, for which no jury is needed").

Since the determination of the constitutional barrier of former jeopardy precludes trial and thus removes from the jury the issue of guilt or innocence, we feel that the defendants' argument here is without constitutional merit. Appellants argue that the case of *Short v. United States*, 91 F.2d 614 (4th Cir.1937), is controlling. This court in *Short* indicated that the jury was to decide the issue of double jeopardy. *Short*, however, was decided before the enactment of Fed.R.Crim.P. 12. Fed.R.Crim.P. 12(b) requires that defenses and objections based on defects in the institution of the prosecution, including former jeopardy, be raised prior to trial.[9] These issues, not involving the issue of the defendant's guilt or innocence which constitutionally a jury must decide, may be resolved by the court. We also find inapposite the cases on which appellants rely for the proposition that the determination of whether there is one conspiracy or multiple conspiracies in a given case is a jury question. Many of those cases involved a challenge to a jury verdict of guilty of the single conspiracy charged. The defendants in those cases alleged that the evidence at trial had shown the existence of two or more conspiracies and, thus, the proof of guilt of the single conspiracy charged was inadequate. *United States v. Orozco-Prada*, 732 F.2d 1076, 1086 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Winship*, 724 F.2d 1116, 1122 (5th Cir.1984), *United States v. Thomas*, 586 F.2d 123, 131–32 (9th Cir.1978); *United States v. Heath*, 580 F.2d 1011, 1022 (10th Cir.1978),

---

9. Fed.R.Crim.P. 12 provides in part:

  (b) **Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
  (1) Defenses and objections based on defects in the institution of the prosecution;
  . . . .

  (e) **Ruling on Motion.** A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

*cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979). Another case cited involved a challenge to a jury finding of guilt on two conspiracy counts where the defendant argued that the evidence could support conviction only as to a single conspiracy, *United States v. Alberti,* 727 F.2d 1055, 1059 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 199, 83 L.Ed.2d 131 (1984). Those cases did not involve jury resolution of prior jeopardy claims. Rather, they involved challenges to jury findings on the fundamental issue of guilt or innocence of the offenses charged. In sum, we hold that the district court correctly determined that the court, and not the jury, was to decide the issue of former jeopardy.

Having decided that the district court exercised proper authority in determining the validity of the appellants' double jeopardy claims, we next decide whether the district court correctly applied the law of double jeopardy. We treat first the double jeopardy claims of MacDougall, Sanders and Gunn. Again, these appellants were either acquitted of the indictment number 165 charges against them, or the 165 charges were dismissed as to them. MacDougall, Sanders, and Gunn now challenge their conspiracy convictions on the grounds that the conspiracies charged in indictment number 166 were part of the same conspiracies charged in indictment number 165, and thus, the prosecution in number 166 violated their fifth amendment rights.

We compare the offenses underlying the two South Carolina indictments. MacDougall was charged in indictment number 165 with conspiracy to import marijuana and hashish in violation of 21 U.S.C. § 963, conspiracy to possess with intent to distribute the substances in violation of 21 U.S.C. § 846 and various substantive controlled substances offenses. Prior to trial on the number 165 charges, the government dismissed with prejudice the charges against MacDougall. MacDougall was then tried in indictment number 166 on charges of violating the same conspiracy statutes charged in indictment number 165, as well as substantive counts alleging importation of marijuana in violation of 21 U.S.C. §§ 952(a) and 960 (Counts Seven, Nineteen), possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Counts Eight, Twenty), importation of hashish in violation of 21 U.S.C. §§ 952(a) and 960 (Count Thirteen), and possession of hashish with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count Fourteen). Prior to trial on indictment number 166, MacDougall moved for dismissal of Counts One and Two, the conspiracy counts, on the grounds that the dismissal with prejudice of the number 165 charges barred prosecution in this case on double jeopardy grounds. The district court denied MacDougall's motions. At the close of the evidence, however, the district court entered findings of not guilty on Counts Seven, Nineteen, and Twenty charging MacDougall with importation and possession of marijuana. The jury convicted MacDougall on the five remaining counts—the two conspiracy counts, possession of marijuana with intent to distribute, Count Eight, and importation and possession of hashish, Counts Thirteen and Fourteen.

Gunn was charged in indictment number 165 with conspiracy to import marijuana and hashish and conspiracy to possess the substances with intent to distribute as well as substantive offenses. Indictment number 165 was dismissed with prejudice as to Gunn during trial on those charges. He was then tried and convicted under indictment number 166 of conspiracy to import hashish and marijuana and conspiracy to possess with intent to distribute the substances. Sanders was charged on the two conspiracy counts and substantive counts in indictment number 165. At trial on the 165 charges, the jury found Sanders not guilty. In indictment number 166 he was charged and convicted of the two conspiracy counts and with importation and possession of hashish in violation of 21 U.S.C. §§ 952(a) and 960 and 28 U.S.C. § 841(a)(1), (b)(6) (Counts Twenty-three and Twenty-four).

The essence of our inquiry is whether the government has impermissibly divided a

single conspiracy into two conspiracies by charging a violation of the conspiracy statute in two separate indictments. The double jeopardy clause clearly prohibits the division of a single criminal conspiracy into multiple violations of a conspiracy statute. *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942); *United States v. Lurz*, 666 F.2d 69, 74 (4th Cir.1981), *cert. denied*, 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982); *United States v. Thomas*, 759 F.2d 659, 661 (8th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). The traditional test used to determine whether separate indictments charge the same offense is the *Blockburger* "same evidence" test. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir.1983) (under *Blockburger*, offenses deemed identical for the purposes of the double jeopardy clause where the evidence required to support conviction in one of the prosecutions sufficient to support conviction in the other prosecution), *cert. denied*, —— U.S. ——, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984). The same evidence test, however, is of limited value in deciding double jeopardy claims raised with respect to successive conspiracy prosecutions. If the "same evidence" test was the sole standard for determining whether multiple conspiracies exist, then prosecutors could carefully draw two indictments by choosing different sets of overt acts and make one conspiracy appear to be two. *Thomas*, 759 F.2d at 662; *United States v. Bendis*, 681 F.2d 561, 564–65 (9th Cir.1981), *cert. denied*, 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982). Simply limiting our inquiry in the instant case to a comparison of the two indictments would quickly lead to a finding of separate conspiracies. Of the fifty-two overt acts alleged in indictment number 166 and the forty-three acts listed in number 165, only two acts are common to both indictments. Our inquiry is not so limited, but extends beyond a facial comparison of the indictments provided by the "same evidence" test.

■ Many courts have recognized that in conspiracy cases involving double jeopardy claims a "totality of the circumstances" or "full study of the indictments and evidence" test provides a more accurate analysis than the "same evidence" test. *Thomas*, 759 F.2d at 662; *United States v. Arbelaez*, 719 F.2d 1453, 1458 (9th Cir.1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *see Lurz*, 666 F.2d at 74 (recognizing validity of "totality of the circumstances" approach). In developing this test, courts have identified five factors to consider in evaluating double jeopardy claims: 1) time periods in which the alleged activities of the conspiracy occurred; 2) the statutory offenses charged in the indictments; 3) the places where the alleged activities occurred; 4) the persons acting as co-conspirators; and 5) the overt acts or any other descriptions of the offenses charged which indicate the nature and scope of the activities to be prosecuted. *Thomas*, 759 F.2d at 662; *Sinito*, 723 F.2d at 1256. We agree that the five-factor "totality of the circumstances" test is a correct approach. In our view, however, a flexible application of the test rather than rigid adherence is a more useful policy in making the ultimate determination. *See Lurz*, 666 F.2d at 74–75 (recognizing totality of the circumstances test, but not undertaking complete five-part analysis, where finding of separate conspiracies sufficiently supported by differences in geographic locations and personnel involved).

■ Here, we must determine whether the separate organizations perpetrated separate conspiracies or whether the organizations—despite their distinct internal structures—formed a single conspiracy. We conclude that the conspiracies charged in indictment 165 and in indictment 166 are separate conspiracies, and thus, appellants' prosecution in this case was not barred by the double jeopardy clause.

Before applying the five-factor test to the facts of this case, we briefly review the district court's disposition of the double jeopardy claims. The district court deter-

mined that the Riley-Harvey and the Rhoad-Foy organizations were engaged in separate conspiracies. It reasoned, therefore, that the prosecution of MacDougall, Gunn and Sanders in indictment number 165 charging the Rhoad-Foy conspiracies did not bar their prosecution for activities as members of the Riley-Harvey organization. In reaching its decision, the district court rejected the appellants' contention that the two organizations were part of one major smuggling and distribution conspiracy. In *Lurz,* this court, applying the "clearly erroneous" standard, upheld a district court's determination of the existence of two independent conspiracies. 666 F.2d at 74. The district court in *Lurz* gave careful and repeated consideration at two pretrial hearings and at the end of government's case to the question of whether there were one or two conspiracies. The district court allowed the defendant to develop the record and to present arguments for his position. *Id.* Similarly, the district court, in the instant case, provided the appellants hearings on the double jeopardy issue before and during the trial and allowed them full opportunity to develop the record and present arguments for their position.

Applying the totality of the circumstances test in the flexible manner which we think is appropriate, we are persuaded that two factors are most significant in this appeal: the identity of the persons acting as co-conspirators and the relationship between the activities of the conspiracies charged in the several indictments. The final versions of indictments 166 and 165 charged eight of the same defendants, out of a total of twenty-three named in 166 and twenty-four named in 165. At one time or another, from the original indictments up to the second superceding indictment in 166, twelve defendants were named in both

165 and 166, including Gunn, Sanders and MacDougall.[10] In indictment 151, the major Eastern District of Virginia prosecution of the Pernell-Toombs organization, which also charged Leon Harvey with engaging in a continuing criminal enterprise, the government submitted a list of over 120 unindicted participants, including eleven individuals indicted in either 165 or 166. That list included Gunn, MacDougall, Michael Harvey, Leslie Riley and Barry Foy. The suggested link between the 151 conspiracy and the 166 conspiracy, however, was undercut by testimony at trial in the instant case of the vast number of ventures undertaken independently by each organization and by testimony that the four appellants were not members of Pernell's organization. Finally, we note that neither MacDougall, Gunn nor Sanders was placed in jeopardy by the Eastern District of Virginia prosecution.

In view of the enormity of the conspiracies involved and the size of the individual ventures, we are not persuaded that the level of overlap of defendants indicates the existence of a single conspiracy. There is no rigid formula for determining at what level of overlap two conspiracies become one. Rather, the issue is whether the evidence of overlapping personnel establishes a single conspiratorial scheme. We find that here it does not. *See United States v. DeFillipo,* 590 F.2d 1228, 1234 n. 7 (2d Cir.) (no double jeopardy violation where one indictment named seven persons, the other six, and four overlapped), *cert. denied,* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); *United States v. Booth,* 673 F.2d 27, 29 (1st Cir.) (substantially different personnel where ten defendants were common to indictments alleging twenty-four and nineteen defendants, respectively), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982).[11]

---

**10.** Sanders was acquitted on the 165 charges, and the charges as to MacDougall were dismissed prior to the trial in that case. Gunn was dropped from indictment 165 when evidence at the trial of 165 indicated that he had been improperly charged in that conspiracy—a fact

tending to support the district court's determination of separate conspiracies.

**11.** In *Lurz,* this court held that there may be two distinct conspiracies "even though they may involve some of the same participants." 666 F.2d at 74. Lurz, however, was the only defendant

The most complex of the factors in our analysis is the significance of the extensive joint ventures involving the three organizations—in other words, whether the individuals were working together to further one conspiracy or multiple conspiracies. An obvious pattern of mutual cooperation continued throughout most of the period in which the Riley-Harvey and Rhoad-Foy organizations were active. In addition, the Riley-Harvey organization cooperated in many ventures with the Pernell-Toombs organization. Clearly, the Rhoad-Foy and the Riley-Harvey organizations participated in at least three joint ventures: 1) the importation of 9,500 pounds of marijuana in September 1978 involving the vessel "Straightaway," 2) the hashish operation in June 1980 involving the vessel "Second Life," and 3) the final drug smuggling venture ending in late 1981. Riley also participated with the Rhoad-Foy organization in the Coconut Grove, Florida expedition in 1974, which, of course, occurred prior to the establishment of the Riley-Harvey organization.

The appellants, however, assert that the overlap between the Riley-Harvey and Rhoad-Foy operations extended beyond the four ventures described above, and that a number of other ventures were in fact joint ventures. Their theory is that the degree of overlap and the number of joint ventures link the two organizations into one conspiracy, and thus, having been tried once for their involvement in the conspiracy, they cannot be tried again on charges resulting from the same conspiracy. The record, however, does not support their contentions. For example, appellants assert a link between the Riley-Harvey organization and a November 1979 venture of the Rhoad-Foy and the Pernell-Toombs organizations involving the importation of approximately 8,000 pounds of marijuana from Samana Cay into the United States at Edisto Island, South Carolina. The evidence cited by appellants to link this venture to Riley-Harvey was the grand jury testimony of Stephen Ravenal, one of the

overlapping between two conspiracies involving

unindicted co-conspirators in the Eastern District of Virginia prosecution, that Leon Harvey was involved in the preparation of the venture. Ravenal, however, subsequently testified before the grand jury that Harvey may not have been involved in the venture.

The appellants also attempt to link another Riley-Harvey venture, the importation of 10,000 pounds of marijuana onboard the vessel "Omega" in late summer or early fall of 1980, to the Rhoad-Foy organization because Pinckney Greene, a member of the Rhoad-Foy organization, had supplied the vessel. Warren Steele, charged with engaging in a continuing criminal enterprise in indictment 166 with Riley and Harvey, testified, however, that Greene approached him about using the "Omega" and that Greene "had had prior dealings with, I think Barry Foy and Tom Rhoad, and he didn't seem to be happy working there." This testimony suggests, if anything, the independent nature of the two conspiracies. The other evidentiary links which the appellants offer are similarly weak. In an August 1980 venture in which the Rhoad-Foy organization imported approximately 18,000 pounds of marijuana into South Carolina, Riley referred a crew member, John Jamison, to Foy for work on the vessel. Similarly, Rhoad's former girlfriend was quoted in an FBI report as having told the FBI that Rhoad invested money in a Riley-Harvey venture involving the vessel "LaCativa" in January 1981. Even if one or two of these apparently separate ventures were, in fact, joint ventures, the far greater number of independent ventures undertaken by each of the three organizations supports the finding of separate conspiracies.

At trial of the instant case, Pernell, a lead defendant in indictment 151 in the Eastern District of Virginia, testified that his organization had undertaken approximately fifty-two smuggling operations, of which forty-five were successful, and that he had done joint ventures with other groups including seven or eight with the

twenty-three and four defendants, respectively.

Rhoad-Foy organization and either seven or fifteen to twenty joint ventures with the Riley-Harvey organization.[12] Pernell also testified that Leon Harvey had informed him in early 1981 that the Riley-Harvey organization had successfully completed twenty-eight straight marijuana importations into Hilton Head alone and that the Riley-Harvey organization was using off-load sites other than Hilton Head.

The complicating factor in juxtaposing these illegal activities for the purpose of determining whether there existed one criminal conspiracy or several is that most of the leaders of these smuggling and distribution organizations had worked with each other, were acquainted with each other, had at times planned joint ventures, and in some instances shared the profits of overlapping operations. Similarly, the organizations used some of the same support personnel. For example, Leslie Riley had been employed by Rhoad-Foy and Pernell-Toombs as a boat captain in a number of ventures between 1974–1977. Greene, a member of the Rhoad-Foy organization, used a vessel he had purchased with Rhoad and Foy in a deal with the Riley-Harvey organization. Mike Abell worked for both organizations as an offloader and driver. As we noted previously, twelve defendants, at one time or another, were indicted in both 165 and 166, including MacDougall, Gunn and Sanders.

Cooperation, pooling of risk, and exchange of personnel over a prolonged period of time are not inconsistent with a finding of independent conspiracies. Here, Pernell testified that in 1977 Riley and Harvey "were just forming their group or their partnership, for the purpose of smuggling marijuana." He testified that none of the appellants in this case was a member of his organization. He was also unaware of exactly how Riley-Harvey financed their portion of the joint ventures. Pernell testified that at times the various organizations

would be considered part of a large structure, but that at other times they would have a separate structure of their own. Participation in activities furthering one conspiracy is not inconsistent with the achievement of the goals of a second conspiracy and does not preclude culpability for separate conspiracies. *See United States v. Ruggiero,* 754 F.2d 927, 934 n. 13 (11th Cir.) (one overt act can be in furtherance of two conspiracies), *cert. denied,* —— U.S. ——, 105 S.Ct. 2661, 86 L.Ed.2d 277 (1985); *United States v. Ingman,* 541 F.2d 1329, 1331 (9th Cir.1976) (an action may be in furtherance of two or more conspiracies; some interrelationship between conspiracies does not make them the same criminal enterprise).

We, of course, have considered the three other factors in the five-part totality of the circumstances test, but do not find that they bear as heavily on the ultimate determination of whether there were one or more conspiracies. To reiterate, the remaining three factors of the totality of the circumstances test relate to the statutory offenses charged, the location of the conspiracy activities and their time periods. As to the first of these factors, MacDougall, Gunn and Sanders were charged with the same statutory violations in the conspiracy counts of both indictments 165 and 166. Where the government charges major drug importation and distribution conspiracies, however, the fact that both indictments charge violations of 21 U.S.C. § 963, prohibiting conspiracy to import, and 21 U.S.C. § 846, prohibiting conspiracy to possess with intent to distribute, is not surprising and does not prevent the government from establishing the existence of separate conspiracies. *See United States v. Booth,* 673 F.2d at 30; *United States v. Futch,* 637 F.2d 386, 391 (5th Cir.1981) (identical statutory offenses would be factor common

12. The exact number of joint ventures between Riley-Harvey and Pernell-Toombs is unclear. At one point, Pernell testified to fifteen to twenty such ventures (Appendix 2575) and at another to only seven (Appendix 2659, 2756). At the appellants' trial, Pernell described his organization, saying that he was the "co-boss" with Toombs; Toombs being the chairman of the board, Pernell the president.

to separate conspiracies carried out in similar manner).

With respect to the location of the activities, we note that while both the Riley-Harvey and Rhoad-Foy organizations were heavily involved in South Carolina and used some of the same locations for off-loading, the Riley-Harvey organization operated more extensively along the east coast. Further, within South Carolina, the operations had substantially different off-load locations.

There is no question that there is substantial temporal overlap between the conspiracies charged in indictment 165 and those of which the appellants were convicted. The indictment in this case charged overt acts beginning in 1974. Proof at trial, however, established that the conspiracy led by Les Riley and Leon Harvey began in 1977. Appellants allege that evidence of acts prior to the formation of the Riley-Harvey conspiracy was used against them but do not point to any prejudice at trial from the inclusion in the indictment of overt acts relating to that period. Most references cited by appellants to those acts concern evidence in discovery, grand jury testimony and proceedings other than appellants' trial. A review of the references at trial convinces us that they do not establish a basis for reversible error. For example, defense counsel elicited testimony of a pre-1977 venture during cross-examination of a government witness. There was no objection by co-counsel, and we do not feel that the defense by this action can create reversible error. We also find that the admission of the somewhat confusing direct testimony of government witness Warren Steele relating to a 1977 venture involving the vessel "Fat Chance" was, if error, certainly harmless beyond a reasonable doubt in view of the overwhelming evidence of appellants' guilt. Moreover, defendants did not object to this portion of Steele's testimony. In sum, while we do not dismiss the overlap of time periods as a factor, we find that, in this case, its minimal relevance is effectively considered in our analysis of the significance of the overlapping activities between the conspiracies.

We conclude from our consideration of the five stated factors that the level of cooperation between the Rhoad-Foy organization's conspiracies charged in indictment 165 and those of the Riley-Harvey organization charged in 166 is insufficient to link the organizations into a single conspiratorial scheme. The organizations were formed around separate conspiratorial agreements; they had separate management structures; and, they pursued primarily independent ventures. Consequently, the prosecution of MacDougall, Gunn and Sanders in indictment 165 did not bar their prosecution for their activities in furtherance of the conspiracy to import and the conspiracy to possess with intent to distribute charged in 166.

### Michael Harvey's Double Jeopardy Claim

■ We next turn to Michael Harvey's double jeopardy claims. Harvey and his brother, Leon Harvey, were charged in the Eastern District of Virginia in indictment 31–A with conspiracy to possess with intent to distribute hashish and with several substantive counts. While the indictment charged Leon Harvey with conspiracy to import hashish, Michael Harvey was only charged with conspiracy to possess with intent to distribute and substantive charges. Pursuant to a plea bargain, Harvey pled guilty to one count of causing an individual to travel in interstate and foreign commerce in facilitation of unlawful purposes in violation of 18 U.S.C. § 1952(a)(3). In return, the government dismissed all other counts against him, including the charge of conspiracy to distribute. It is the entire Eastern District of Virginia prosecution, ending in his plea and sentencing, which forms the basis of Michael Harvey's double jeopardy argument. He argues that the government's statement of facts in the Virginia plea agreement and presentence report outlined his identical involvement in the importation conspiracy charged in Count One of the South Carolina indictment 166. He also asserts that the details of his involvement

in the "Second Life" hashish operation contained in the presentence report are the basis of his conviction on South Carolina Count Thirteen. Harvey urges that for these reasons his prosecution in South Carolina is barred on double jeopardy grounds.

Prior to trial, the South Carolina district court in the instant case dismissed Counts Two and Fourteen charging Michael Harvey with conspiracy to possess with intent to distribute and substantive possession on the grounds that the Eastern District of Virginia prosecution had placed him in jeopardy for the same offenses. Trial on Counts One and Thirteen—conspiracy to import and importation of hashish—then proceeded against Harvey, and the jury convicted him on both counts. During the trial, the district court permitted Harvey's counsel to argue the issue of double jeopardy in the expectation that the jury would resolve the issue. Thus, in his opening statement to the jury, Harvey's counsel conceded Harvey's guilt on the charges underlying the convictions now on appeal. He argued that Harvey's guilt was not at issue, but that the prosecution was barred by the proceedings in the Eastern District of Virginia.

Overruling the government's objections, the district court allowed the defendant to proceed with the development of a factual basis for his double jeopardy claim. The court indicated that it expected to charge the jury with respect to Harvey's double jeopardy claims. The court subsequently determined, however, that it should resolve the double jeopardy issue, thus removing the issue from the jury and leaving Harvey without a jury defense. It ruled that, as a matter of law, the indictment charged a conspiracy separate from any other conspiracy with which the defendants had been charged. As a consequence, the jury was not allowed to consider the affirmative defense of double jeopardy. We recognize the correctness of the district court's ruling that the court should decide whether a prosecution is barred as the result of double jeopardy considerations. Nevertheless, the confusion created by the court's original ruling and exacerbated by the court

permitting Harvey's opening statement, including the admission of guilt, and not declaring a mistrial, deprived Harvey of a fair trial. As to Harvey, we remand for a redetermination by the district court of the question of double jeopardy. Initially, the district court must determine if the proceedings in the Eastern District of Virginia placed Harvey in jeopardy with respect to any part of the offenses charged in South Carolina Counts One and Thirteen. If so, it will be necessary to determine the scope of the double jeopardy bar, that is, what transactions are barred from prosecution. Should the court determine that there is no complete double jeopardy bar to retrial, the government may then proceed to retry Michael Harvey for any offense not barred by either double jeopardy or the plea bargain in the Eastern District of Virginia.

### Gunn's Claim of Prosecutorial Vindictiveness

Gunn also contends that the district court erred in failing to dismiss the indictment against him on grounds of prosecutorial vindictiveness. He alleges that he was indicted in the second superceding indictment in indictment 166 because he had secured his acquittal on the conspiracy and substantive importation charges brought against him in indictment 165. During the presentation of the government's case in that earlier prosecution, Gunn moved for acquittal based on evidence which he had received from the government during discovery. The government joined with the defense in moving for acquittal, stating that the evidence it had against Gunn related more to the smuggling activities of the Riley-Harvey conspiracy charged in indictment 166. After dismissal of the charges against Gunn in indictment 165, the government entered the charges against him in indictment 166, the convictions of which he challenges in this appeal.

Gunn maintains that the government indicted him in 166 only because he successfully asserted his constitutional rights to put the government to its proof in the earlier case. We find Gunn's claim without

merit. Apparently, Gunn was improperly charged in the indictment revolving around the conspiracy alleged in indictment 165. Made aware of the error, the government conceded the improper charges and joined in moving for dismissal. The government subsequently reindicted Gunn on the correct charge. While the government may be guilty of sloppiness in the preparation of the indictments, its conduct does not amount to constitutionally impermissible vindictive prosecution. The government has not increased the charges against the defendant because of his invocation of his constitutional rights. *See Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) (reindictment of defendant on a more serious charge after he pursued his statutory right of appeal from conviction on a lesser charge violated due process clause). *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir.1983) (en banc) (charge of vindictive prosecution following a prosecutorial decision to increase the number or severity of the charges after a successful exercise of constitutional rights examined in context of entire proceedings; no presumption if any objective event or culmination of events in proceedings indicated to a reasonable minded defendant that the decision to increase severity of the charges was motivated by some purpose other than vindictive desire to deter or punish appeals), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984). Gunn asserts that this court should apply in his appeal the analysis applied when the government increases the charges following a criminal defendant's exercise of a statutory or constitutional right. Here, however, the defendant was charged in a separate case involving what we have determined was a different conspiracy. The connection between the dismissal in 165 and the reindictment in 166 is clear and legitimate. The discovery during trial in indictment 165 that the evidence against Gunn did not support that indictment, but rather prosecution in another case, led to his indictment in 166. We also note that, while not dispositive, Gunn was charged with fewer counts in indictment

166 than in 165. Thus, the case is factually distinguishable from *Blackledge v. Perry* in which the prosecution changed a misdemeanor charge to a felony charge after a convicted defendant exercised his right to obtain a trial de novo following his misdemeanor conviction. Gunn has not demonstrated any evidence of vindictiveness on the part of the government, nor any circumstance from which we should presume vindictive motivation. In sum, we find that Gunn has failed to show his indictment in 166 was the result of prosecutorial vindictiveness.

### Challenges to Sufficiency of the Evidence

#### MacDougall

■ We next turn to the appellants' assertions that the evidence is insufficient to support several of their convictions. MacDougall challenges his convictions on the conspiracy to import and importation of 30,000 pounds of hashish aboard the vessel "Second Life" in June 1980, on the grounds that the evidence showed that his sole duty in that venture was to serve as an offloader after the act of importation was complete. He also challenges the sufficiency of the evidence regarding his conviction on Count Eight—possession with intent to distribute relating to a cargo of approximately 9,000 pounds of marijuana unloaded at Calibogue Cay, Hilton Head in 1979.

The issue in MacDougall's challenge to his convictions of conspiracy to import and importation of hashish is not factual; the government does not dispute MacDougall's self-characterization as an offloader. Rather, the question is a legal one: at what point did importation cease? The essence of MacDougall's argument is that the importation of hashish was complete once the contraband had crossed the United States border, which occurred in this case when it entered the territorial waters of the United States. We disagree. MacDougall's argument would allow the imaginary boundary line not only to establish the requisite international element in importation, but also divide artificially and inaccurately into two

separate components the process by which drugs are imported into the United States. Importation is a continuous crime not complete until the controlled substances reach their final destination and the cargo is offloaded. *United States v. Corbin*, 734 F.2d 643, 652 (11th Cir.1984) (importation still in progress at time marijuana was offloaded; offloading furthered the conspiratorial objectives of importation and possession with intent to distribute the marijuana).

MacDougall cites *Palmero v. United States*, 112 F.2d 922 (1st Cir.1940) for the proposition that the act of importation was complete when the contraband entered territorial waters. In *Palmero*, the First Circuit rejected the contention that the presence of narcotics in United States waters was insufficient to support a conviction for importing contraband and that the prohibited act of importation occurred only when the narcotics were landed. 112 F.2d at 924–25. Our holding here does not conflict with the rationale of *Palmero*. While crossing into United States waters in *Palmero* was sufficient to *establish* importation, that event is not necessarily also the *termination* of the act of importation. Those who unload a vessel carrying the imported contraband are an essential component of furthering the conspiracy to import. Common sense alone is sufficient to refute the proposition that off-loaders of marijuana and hashish transported by sea going vessels to United States shores cannot be instruments of the proscribed importation. The evidence was more than sufficient for the jury to conclude beyond a reasonable doubt that MacDougall had joined the conspiracy to import.

With respect to MacDougall's challenge to his conviction on Count Eight, possession with intent to distribute marijuana, the jury heard apparently conflicting testimony as to MacDougall's involvement in that crime. George Strickland, who worked for the Riley-Harvey organization during two ventures in early 1979, testified that he saw MacDougall at the off-load site of the 8,000 pound marijuana venture. Warren Steele, one of the organizers of the Count Eight venture, testified that MacDougall

was not involved in the only drug venture in which Steele claimed to have participated during this time period. In reviewing a jury verdict of guilty, an appellate court must examine the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Jones*, 735 F.2d 785, 790 (4th Cir.), cert. denied, —— U.S. ——, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). A decision to overturn a jury verdict for want of substantial evidence must be confined to cases where the prosecution's failure to meet its burden of proof is clear. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Grubbs*, 773 F.2d 599, 601 (4th Cir.1985). As this court has stated, "[t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *Jones*, 735 F.2d at 791 (quoting *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982)).

It is the jury's function to resolve inconsistencies in the evidence and to make factual determinations. In this case, they did so and found MacDougall guilty of the offense. Viewing the evidence in the light most favorable to the government, we must uphold the jury verdict unless we determine that there is no reasonable basis upon which a rational trier of fact could find MacDougall guilty beyond a reasonable doubt. Strickland's testimony placing MacDougall at the off-load site, we believe, is sufficient to meet this standard and provided a basis for a jury to conclude beyond a reasonable doubt that MacDougall participated in the offense charged.

*Sanders*

Sanders attacks his convictions on Counts One and Twenty-three, conspiracy to import and importation, on the same grounds as MacDougall's attack on his importation convictions, *i.e.*, as an off-loader,

he could not be convicted of conspiracy to import and of a substantive importation count. We affirm these convictions for the same reasons as we affirmed MacDougall's convictions on Counts One and Thirteen.

*Gunn*

Gunn challenges his conviction on conspiracy to distribute marijuana and hashish on the grounds that the evidence that he was a crew member on sailing vessels importing large quantities of marijuana and hashish is insufficient to prove his guilt in the distribution conspiracy. There is no question of his culpability on the charge of conspiracy to import. The issue is whether Gunn possessed the requisite awareness of the distribution conspiracy and evidenced an intent to join it.

■■■■ The presence of large quantities of marijuana is clearly sufficient to establish the existence of the intent to distribute. *United States v. Manbeck*, 744 F.2d 360, 390 (4th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). A multi-ton quantity of drugs is not for personal use. Proof of the existence of a conspiracy to distribute, however, does not prove that an individual involved in the importation conspiracy is necessarily involved in the conspiracy to distribute. *Id.* at 389–90. *See also United States v. Watkins*, 662 F.2d 1090, 1097 (4th Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982); *United States v. Laughman*, 618 F.2d 1067, 1075 (4th Cir.) (simply proving the existence of a conspiracy cannot sustain a verdict against an individual defendant; proof of that defendant's knowledge of the conspiracy's purpose and some action indicating participation required), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). The issue here is whether the evidence sustains the jury's finding that Gunn joined the distribution conspiracy. The government must establish the defendant's knowl-

edge and participation. *Manbeck*, 744 F.2d at 386. Direct evidence of the elements of a conspiracy, however, is not necessary. Circumstantial evidence is sufficient, *id.*, such as acts committed by the defendant or circumstances which indicate a plan or scheme. *United States v. Williford*, 764 F.2d 1493, 1500–01 (11th Cir.1985).

■■■■ The defendant's role may be minor.[13] Nevertheless, the government must establish that connection, however minor, by proof of guilt beyond a reasonable doubt. Here, even viewing the evidence with the inferences most favorable to the government, we hold that the evidence raises reasonable doubt as to his guilt on the conspiracy to distribute count, and we reverse Gunn's conviction on this one count.

In *Manbeck*, this court explicitly declined to reach the result reached by the Fifth Circuit in *United States v. Michelena-Orovio*, 719 F.2d 738 (5th Cir.1983), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984), that participation in the importation of a large quantity of marijuana is sufficient to establish guilt of conspiracy to distribute the substance. 744 F.2d at 388–390. Consequently, the government must offer other evidence to meet its burden of proof.

The jury in this case heard testimony that 584 grams of hashish were found in Gunn's bag when he was arrested at the Savannah airport following the "Caroline C" venture. This court in *Manbeck* held that where a crew member possesses his own cache, a fair inference would be the intent to both import and distribute. 744 F.2d at 390. We did not need, however, to decide what amount would be necessary to distinguish between possession and possession with intent to distribute. In our view, given the facts of this case, particularly the size of the "Caroline C" cargo, 584 grams or approximately one-half kilogram of hashish, is insufficient. Campbell also tes-

---

13. The Eleventh Circuit has held:
    [T]he requirement of knowledge of the conspiracy agreement refers simply to knowledge of the essential objective of the conspiracy. To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may play only a minor role in the total operation.
    *Corbin*, 734 F.2d at 643 (quoting *United States v. Badolato*, 701 F.2d 915, 920 (11th Cir.1983)).

tified that Gunn participated in meetings with organizers of the conspiracy, including Leslie Riley and Leon Harvey. The subject of the meetings concerned arrangements for importation. The government argues that Campbell's testimony that Gunn deposited a bale of hashish on-shore after the unloading of the "Second Life" establishes his involvement in the conspiracy to distribute. Campbell's testimony, however, indicated that Gunn, who was drunk at the time, dropped the bale on-shore to remove it from the vessel so that the vessel could clear customs. There is no indication that this act was part of any distribution plan but was rather a concluding act of the importation.

Similarly, Gunn's participation in the off-loading of the hashish from the "Caroline C" at a dock in North Carolina was insufficient to establish his connection to the conspiracy to distribute. In sum, we cannot infer Gunn's participation in the conspiracy to distribute marijuana and hashish solely from his involvement in the conspiracy to import them. There is practically no other evidence of his participation in the distribution conspiracy so we must reverse his conviction as to that count.

Lastly, we find no merit in the appellants' contention that the district court's denial of the bill of particulars prejudiced their ability to prepare for trial and, in particular, to prepare their affirmative defense of double jeopardy. The decision to grant or deny a motion for a bill of particulars lies within the sound discretion of the trial court and may be challenged only on the basis of abuse of that discretion. *United States v. Dulin,* 410 F.2d 363, 364 (4th Cir.1969); *United States v. Garrett,* 727 F.2d 1003, 1010 (11th Cir. 1984), *aff'd,* — U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). The appellants fail to show that the lack of a bill of particulars prejudiced their defense or resulted in actual surprise at trial. We, therefore, find no abuse of discretion on the part of the district court.

AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.