820 F.2d 1220
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mansour ALI, Defendant-Appellant.
 No. 86-5084.
 United States Court of Appeals, Fourth Circuit.
 Argued May 5, 1987.
Decided June 2, 1987.
 
 Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.
 Kenneth Michael Robinson, for appellant.
 William G. Otis, Assistant United States Attorney (Henry E. Hudson, United States Attorney; Jack I. Hanly, Assistant United States Attorney, on brief), for appellee.
 PER CURIAM:
 
 
 1
 In this case Mansour Ali Appeals his conviction for violation of 21 U.S.C. Sec. 841(d) (possession of piperidine with intent to manufacture phencyclidine [PCP] or with reasonable cause to believe that it will be used to manufacture phencyclidine) and 21 U.S.C. Sec. 846 (conspiring to possess piperidine as prohibited in section 841(d)). Finding sufficient evidence to support his convictions and no errors of law, we affirm.
 
 
 2
 In 1985 Louis Buckingham, president of Premier Chemicals in Burke, Virginia, received a call from an associate alerting Buckingham to a potential new customer. That customer was Arnold Smith (later identified as appellant Ali), allegedly a Philadelphian who wanted to purchase janitorial supplies. Shortly thereafter Smith and two colleagues, West and Boone, met with Buckingham to discuss possible purchases. They did not place any orders at that time.
 
 
 3
 Smith, West, and Boone met with Buckingham several more times, with Smith conducting the business for the trio. At the second meeting Smith gave Buckingham a list of seven chemicals he wanted: "pairdine," cyclohexanone, bromo benzyne, potassium cyanide, sodium metabisulphite, iodine crystals, and ethyl ether. Because there is no substance called "pairdine," Premier Chemicals' chemist changed this to "pyrrolidine." At the third meeting Smith changed the first item on the list (pyrrolidine) to something which Buckingham spelled phonetically as "pepperdine." Because there is no such substance, Premier's chemist changed it to "piperidine." Smith also deleted the potassium cyanide from his list and added magnesium turnings.[1] At the fourth meeting Smith asked Buckingham to draw up purchase orders for the chemicals: Everett's One-Hour Cleaners was to buy the ethyl ether, District Photo would buy the piperidine, and Rocky's Auto Body would buy the other five items. At the fifth meeting Smith changed the purchase orders so that Rocky's Auto Body was the buyer of four items and Bethesda Auto Body Shop was the buyer for the other three, including the piperidine. Smith paid for the order with $8,000 in cash.
 
 
 4
 After Buckingham requisitioned the chemicals from his suppliers, the company that distributed piperidine filed a form with the Drug Enforcement Administration (DEA). Based on this report and other evidence the DEA obtained a warrant to search Premier Chemicals and seize the piperidine and certain sales records. After the search and seizure Buckingham agreed to cooperate with the DEA.
 
 
 5
 On May 28, 1986, appellant Ali arrived at Premier Chemicals driving a truck owned by his employer, Edwards Trucking Company. Ali, accompanied by West, picked up the chemicals ordered by Smith and signed "Arnold Smith" on the receipt. After the goods were loaded on the truck the DEA arrested Ali and West. Ali and West were subsequently convicted for violating 21 U.S.C. Sec. 846 (conspiracy), and Ali was convicted for violating 21 U.S.C. Sec. 841(d) (possession).
 
 I.
 
 6
 Ali first challenges the sufficiency of the evidence to support his convictions. He contends that he ordered "pairdine" or "pepperdine" but never piperidine. We reject this argument for two reasons. First, this substance was not ordered in isolation. The fact that Ali asked for "pairdine" or "pepperdine" might be insufficient to support a conviction if this were the only chemical he ordered. But when his order included the seven other ingredients necessary to manufacture PCP, plus a nonexistent substance with a name very similar to piperidine, this provided the jury with a sufficient basis for believing that Ali intended to acquire piperidine for the purpose of manufacturing PCP.[2] Second, Ali had numerous opportunities before his arrest to see that his order included piperidine, and to correct this error if he did not intend to acquire that substance. He saw "piperidine" on the order prepared by Premier Chemicals, he copied the word "piperidine" onto the purchase orders, and he accepted a shipment with the word "piperidine" stenciled in large letters on the container. This also gave the jury an adequate basis for believing that Ali intended to acquire piperidine.
 
 
 7
 Ali offered evidence that the piperidine was actually ordered by someone named Sandor Toth, that the piperidine was legitimately intended for use as a fuel additive, and that Buckingham's associate had prior involvement in drug trafficking. Even if these were plausible alternative theories for the inclusion of piperidine in this shipment, the jury was not required to credit the evidence supporting these theories. In reviewing a jury verdict of guilty, we must examine the evidence in the light most favorable to the government. United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir.1986). Our inquiry, therefore, must focus not on the strength of the defendant's evidence and theories, but on the adequacy of the government's evidence. We may reverse only if no rational jury could have found the defendant guilty beyond a reasonable doubt. Id. We cannot say that the government's evidence here that Ali intended to manufacture PCP was so insubstantial that the jury's guilty verdict was irrational.
 
 
 8
 Ali also argues that he and Smith were not the same person, and that he presented evidence to support this contention. Again, however, our task is not to evaluate the strength of Ali's evidence, but to determine whether the government's evidence identifying Ali as Smith was adequate to support the jury's verdict. The sole witness to identify Ali at trial was Buckingham. Although Buckingham had previously made the unfortunate statement that "if you have seen one spook you have seen them all," this does not make his identification of Ali inherently unreliable. Buckingham's in-court identification of Ali as Smith was unequivocal, as was his prior out-of-court identification of Ali's photograph. The jury was informed of Buckingham's possible prejudice against blacks, and we cannot say they acted irrationally in choosing to credit Buckingham's identification of Ali.
 
 
 9
 For the reasons stated above, we find that there was sufficient evidence that Ali was Smith, and that he intended to possess piperidine in order to manufacture PCP.
 
 II.
 
 10
 Ali also contends that there were errors of law in the conduct of his trial. His contentions are without merit and we may dispose of them quickly.
 
 
 11
 First, we find no reversible error in one witness' reference to transcripts of tape recorded telephone conversations between Buckingham and Smith. The court properly struck the transcripts as evidence because the tapes themselves were not admitted, and the record does not show that the jury ever saw or heard the contents of the transcripts. The witness' brief reference to the transcript was general and harmless.
 
 
 12
 Second, we find no reversible error in Buckingham's use of notes to refresh his recollection. Although the government did not expressly ask Buckingham if his recollection needed refreshing, Buckingham testified that he could not recall specific dates without refreshment from his notes, and this provided a sufficient foundation for his use of the notes. It is irrelevant whether the notes were originally prepared by Buckingham or by others because a witness may use any writing to refresh his recollection. United States v. Schwartzbaum, 527 F.2d 249 (2d Cir.1975), cert. denied, 424 U.S. 942 (1976). Ali was invited to inquire into the source and accuracy of the notes on cross-examination, but he made no such inquiry.
 
 
 13
 Third, we find no reversible error in the court's comment, during the cross-examination of Buckingham, that the notion of a fuelless automobile was ridiculous. Ali was permitted to elicit from the witness testimony that piperidine had a legitimate use, that someone was purportedly developing "the world's first fuelless automobile," and that this car would use piperidine. Any further digression into the details of a fuelless automobile would have been irrelevant.
 
 
 14
 Finally, we find no reversible error in the selection of the jury from a venire that was 100 percent white. Although a wholly white venire troubles us, Ali offered no evidence showing that blacks were systematically excluded from the venire. See Batson v. Kentucky, 476 U.S. ----, 106 S.Ct. 1712 (1986). Even if we were to take judicial notice that there are blacks within the Alexandria Division of the Eastern District of Virginia, we could not conclude that the all-white venire was not representative unless we had some evidence showing the percentage of blacks within the jury selection system. Ali offered no such evidence. We cannot find a constitutional violation in the existence of an all-white venire unless there is some evidence that blacks are so numerous within the Alexandria Division that if this were a representative jury selection system, an all-white venire would be a near statistical impossibility.
 
 
 15
 For the reasons stated above, we find no errors of law, and we affirm the judgment of conviction.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Piperidine, cyclohexanone, bromo benzyne, sodium or potassium cyanide, sodium bisulphite, iodine crystals, magnesium, and ethyl ether are the ingredients needed to manufacture PCP
 
 
 [2]
 Ali presented evidence that these other ingredients had legitimate uses as cleaning supplies, but the jury was entitled to believe that they were intended to be used to manufacture PCP