850 F.2d 690
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Reuben S. JIGGETTS, Jr. Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Andrew LLOYD, Jr. Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee
v.
William H. CALDWELL, Defendant-Appellant.
 Nos. 87-5075(L), 87-5076 and 87-5133.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 8, 1988.
Decided: June 16, 1988.
 
 Michael Layne Sandul (Michael E. Marr; M. Brooke Murdock, Assistant Federal Public Defender, on brief), for appellants.
 Stephen Matthew Schenning, Assistant United States Attorney (Breckinridge L. Willcox, United States Attorney; Carmina S. Hughes, Assistant United States Attorney, on brief), for appellee.
 Before WILKINS, Circuit Judge, BUTZNER, Senior Circuit Judge, and RICHARD L. WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Reuben Jiggetts, Andrew Lloyd, and William Caldwell appeal from final orders of judgment and conviction entered on the jury's guilty verdict of conspiracy to defraud the United States by impeding the lawful function of the Internal Revenue Service in violation of 18 U.S.C. Sec. 371. (Count 1). Reuben Jiggetts also challenges his conviction for tax evasion pursuant to 26 U.S.C. Sec. 7201. (Counts 2, 3, and 4). And Andrew Lloyd appeals his conviction for making a false statement on a tax return in violation of 26 U.S.C. Sec. 7206(1). (Counts 5 and 6). Counts 7 through 15, charging the three defendants with aiding and abetting the attempt of taxpayers to evade their taxes, were dismissed on the Government's motion the first day of trial. The defendants challenge their convictions for lack of sufficient evidence. Finding ample evidence in the record to support the jury's verdict, we affirm.
 
 I.
 
 2
 Jiggetts', Caldwell's, and Lloyd's convictions stem from their participation in the Freedom Church of the Revelation ("FCR"). Frank Conti founded FCR in 1971 after another entity known as the Universal Life Church ran into difficulties with the Internal Revenue Service ("IRS"). To alleviate these difficulties, Conti formed FCR, installed himself as the presiding bishop, and was thereafter known throughout FCR as Dr. John, Bishop Francis John, and Francis John I. Conti recruited former members of the Universal Life Church and secured tax exempt status for FCR from the IRS pursuant to 26 U.S.C. Sec. 501(c)(3).
 
 
 3
 New members were attracted to FCR by promises of tax advantages resulting from the establishment of home congregations run by newly ordained members. FCR offered new recruits the choice of two plans: a fifty percent plan or a vow of poverty plan. Under the fifty percent plan, a new member paid a minimum fee of $3,600 described as a "free will donation"--entitling the new recruit to a tax deduction. He also received minister credentials and a church charter. The new recruit attended a minister school where he was instructed in setting up a congregational checking account in the name of FCR. The congregational checking account had three signatories consisting of the new member, a family member (usually a spouse), and a third person outside the new member's family. The purpose of having a signature outside the member's family was to demonstrate that the funds placed in the account were outside the control of the member. In this way the minister and the congregation would not run afoul of the prohibition on deducting charitable contributions that resulted in benefits inuring to a private individual. In practice, the third member exercised no control over the congregational account and typically signed checks in blank so that the minister could distribute the monies as he saw fit.
 
 
 4
 New members were told that they could place up to fifty percent of their adjusted gross income into their FCR congregational accounts to be used as parsonage allowance. The allowance could then be used to pay mortgages, rent, gas, electric and other utility bills and related home expenses. All contributions to the parsonage allowance were taken as a tax deduction under the theory that they were contributions to a Sec. 501(c)(3) charitable organization.
 
 
 5
 The FCR leadership created a reporting system to produce documents that substantiated contributions made to the parsonage fund. The minister of a home congregation made quarterly reports to FCR headquarters listing the contributions made to the parsonage account. With the report, the minister sent an amount equal to one percent of the quarterly contributions to be deposited into the "Charity Responsibility Fund"--a fund purporting to carry out charitable works. In return, FCR headquarters sent the minister a receipt for the total amount he had deposited in his parsonage fund indicating that this represented a contribution to a tax exempt organization.
 
 
 6
 As an alternative to the fifty percent plan, FCR also offered its incoming members the option of deferring all income by taking a vow of poverty. Under this approach, after making a "free will donation," larger than that required by the fifty percent plan, the new member received a letter from the FCR directing him to surrender all worldly goods to FCR, continue working at his present job, and direct all income to FCR. A minister who took a vow of poverty, therefore, placed all of his income into the account. The minister was later given instructions on how to complete his tax return to recover withheld taxes.
 
 
 7
 Ministers were also encouraged to recruit new members through a monetary incentive program which operated out of the Freedom College, the marketing branch of FCR. Ministers, or "missionaries," shared in a fixed percentage of the initiation fees--"free will donations"--made by their recruits to the FCR hierarchy. To rise in the Freedom College hierarchy and secure a higher percentage share in free will donations, missionaries needed to meet recruitment quotas.
 
 
 8
 Reuben Jiggetts became involved in FCR in November 1979 through a prior business associate. Because of his marketing skills and the need to promote FCR in the Baltimore-Washington, D.C. area, Jiggetts obtained his home congregation for a reduced initiation fee and rose rapidly in the hierarchy of the Freedom College. Within three months, Frank Conti promoted Jiggetts to Bishop. Over the next three years, Jiggetts rose to the position of Bishop of the Southern Region and received a portion of every free will donation made to the church. As part of his duties, Jiggetts gave introductory seminars to attract new recruits, trained ministers in setting up parish bank accounts and taking charitable deductions on their income tax returns, and instructed ministers on sales techniques to recruit new members. He later brought Henry Caldwell and Andrew Lloyd to FCR to assist him in his duties in the southern region. Caldwell and Lloyd recruited new members and assisted in teaching new ministers FCR techniques. They became Assistant Regional Bishops.
 
 
 9
 By 1982, the IRS began to uncover FCR's scheme. Ministers were audited and their charitable donation deductions were disallowed. In 1983, FCR lost its tax exempt status. Jiggetts resigned and communicated his resignation and his reasons for it to Caldwell and Lloyd.
 
 
 10
 Nonetheless, all three attended FCR's pilgrimage to Las Vegas later in 1983. At the Las Vegas meeting, FCR leadership introduced the American Association of Churches ("AAC") as a remedy to problems that had led to the IRS's disallowance of charitable deductions. Under the AAC plan, FCR ministers would make charitable contributions directly to the AAC instead of congregational accounts. In return, the AAC would make a donation to the congregation in an amount equal to ninety-five percent of the minister's donation. The minister's contribution was fully deductible up to fifty percent of the adjusted gross income of the donor, and the check to the AAC cured the problem of personal benefit or self-inurement which had led to the IRS's disallowance of the FCR deductions.
 
 
 11
 After learning of the plan, Jiggetts, Lloyd and Caldwell began promoting the AAC to the FCR membership in Maryland. They also continued to recruit new members for FCR, although they knew FCR's tax exempt status had been revoked.
 
 
 12
 In the period from 1980 to 1983, each of the defendants earned substantial amounts of money from the sale of ministries to new recruits. None of the defendants declared these monies, which were referred to as "inter-congregational donations," as income for tax purposes. Jiggetts and Lloyd also used the FCR scheme to reduce their taxable income. Consequently, each defendant owes sizable sums in back taxes.
 
 II.
 
 13
 Jiggetts, Caldwell, and Lloyd challenge their convictions on the grounds that the Government's proof at trial failed to establish that the appellants intended to engage in criminal activity. Jiggetts also argues there was insufficient evidence to support the attribution of income generated by his congregation to him. Because there is sufficient evidence in the record from which the jury could conclude that these appellants intended their acts and the natural consequences of those acts, that Jiggets' congregation's account was attributable to him as income, and that Lloyd willfully made a false statement on his tax return, we affirm the appellants' convictions.
 
 
 14
 In reviewing a criminal conviction for the sufficiency of the evidence, an appellate court must consider all the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt considering each element of the offenses charged. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Suthard, 820 F.2d 662, 663-64 (4th Cir.1987). The government is to receive the benefit of all reasonable inferences to be drawn from circumstantial and direct evidence. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). "A decision to overturn a jury verdict for want of substantial evidence must be confined to cases where the prosecution's failure to meet its burden of proof is clear." United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir.1985), citing Burks v. United States, 437 U.S. 1 (1978).
 
 A.
 
 15
 To convict the appellants of a criminal conspiracy, the government must establish the defendants' knowledge and participation in the conspiracy. United States v. MacDougall, 790 F.2d 1135, 1152 (4th Cir.1986). Circumstantial evidence of knowledge and participation in a conspiracy such as acts committed by the defendants or circumstances which indicate a plan or scheme, is sufficient to sustain a conviction. Id. Knowledge may also be inferred from deliberate disregard for the truth. A jury may find that the defendant had knowledge and intent if the jury believes that the defendant had sufficient information to prompt an investigation into the facts but he deliberately closed his eyes to the obvious. United States v. Martin, 773 F.2d 579, 584 (4th Cir.1985).
 
 
 16
 In this instance, an abundance of evidence supports the convictions of the appellants for conspiracy to defraud the United States by impeding the lawful function of the Internal Revenue Service. Jiggetts consulted an accountant before joining FCR and was told that the IRS would likely disapprove of church members' tax deductions and returns. He joined nonetheless, and ignored another accountant's advise to file amended tax returns. Lloyd contends that since he secured an attorney's approval of FCR's tax scheme, he lacked the requisite criminal intent. Although the advice of counsel does not excuse a violation of the law, it is evidence of the good faith of the defendant. See United States v. Carr, 740 F.2d 339, 346 (5th Cir.1984), cert. denied, 471 U.S. 1004 (1985); United States v. Miller, 658 F.2d 235, 237 (4th Cir.1981). The jury heard Lloyd's testimony, considered the defense, and rejected it in this instance.
 
 
 17
 The evidence also supports the jury's possible conclusion that Jiggetts, Caldwell, and Lloyd deliberately ignored information that should have prompted a further investigation of the legality of FCR's tax practices. Jiggetts, Caldwell, and Lloyd occupied prominent positions in the southern region of the FCR. They knew that church members had been audited by the IRS and their charitable contribution deductions disallowed. They attended a FCR meeting discussing the problem of self-inurement and were instructed on how to avoid the disallowance through the creation of AAC. Yet, Jiggetts, Caldwell, and Lloyd continued to recruit members into the church by promoting these illegal tax practices. The appellants also continued to accept their portion of free will donations after they learned that FCR's tax exempt status had been revoked. Based upon this evidence, any rational trier of fact could reasonably conclude that Jiggetts, Caldwell, and Lloyd either knew or failed to adequately investigate the consequences and possible illegality of their acts both before and during their participation in FCR.
 
 B.
 
 18
 Jiggetts also asserts that his convictions for tax evasion under 26 U.S.C. Sec. 7201 (Counts 2, 3, and 4) rest upon income that is not attributable to him. The evidence supports the jury's determination that although the income was in a congregational account, the income was attributable to Jiggetts.
 
 
 19
 Title 26, section 501(c)(3) states that for an organization to be entitled to charitable, exempt status, its exclusive purpose must be charitable, religious, educational, scientific or literary. No part of the organization's earnings may be used in whole or in part for an individual's benefit. 26 U.S.C. Secs. 170, 501(c)(3). Jiggetts suggests that the contributions are properly attributable to him only if the jury found that FCR was a sham. Even if the jury accepted that FCR was founded as a valid religious institution, however, if the jury concluded that Jiggetts' contributions to his congregational checking account inured to his personal benefit, then the contributions are properly attributed to Jiggetts as income. Jiggetts used the congregation's funds to purchase a vacation home, renovations to his house, a mink coat, a television, and his daughter's college tuition. From this evidence, the jury could conclude that the funds were used for Jiggetts' benefit and attributable to him as income.
 
 
 20
 Sufficient evidence also exists to conclude that Jiggetts possessed the requisite intent to evade federal income taxes. Jiggetts knew of the IRS's disallowance of charitable deductions to home accounts because of the self-inurement restriction, yet he continued to take the deduction on his income tax returns. He knew too of the IRS's retroactive revocation of FCR's tax-exempt status. Given this evidence, a rational jury could conclude that Jiggetts willfully attempted to evade federal income taxes in violation of 26 U.S.C. Sec. 7201.
 
 C.
 
 21
 Similarly Andrew Lloyd filed joint income tax returns with his wife for the tax years 1980 through 1983 in which he failed to include his income from money earned from the sale of ministries to new recruits. Again the record is replete with evidence from which the jury could conclude that Lloyd either knew that the failure to include FCR income on his tax returns was illegal or refused to properly investigate the propriety of such actions. As Assistant Regional Bishop, Lloyd was conversant in tax principles. He knew the IRS had revoked FCR's tax-exempt status, and he had no basis for excluding his FCR fees from income. Therefore, Lloyd's conviction for willfully submitting a false statement under penalty of perjury, pursuant to 26 U.S.C. Sec. 7206(1), is affirmed.
 
 III.
 
 22
 Our review of the sufficiency of evidence supporting jury verdicts in criminal cases is limited to the inquiry of whether any rational trier of facts could have found guilt beyond a reasonable doubt for each of the offenses charged. The record abounds with evidence to support the jury's verdict finding the appellants guilty of conspiracy, tax evasion, and submission of a false statement on an income tax return. The orders of judgment and conviction are affirmed.
 
 
 23
 AFFIRMED.